**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CORI-SCHUBERT DE CORI, TRUSTEE OF THE CORI-SCHUBERT DE CORI REVOCABLE TRUST, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>　　v.<br><br>HASELECT-WATERFORD LLC,<br>GRIFFIN CAPITAL MANAGEMENT LLC<br>GRIFFIN ASSET MANAGEMENT LLC,<br>MICHAEL GRIFFIN, and<br>MARCUM LLP,<br><br>Defendants. | **Docket No.** _____<br><br><br><br><br><br><u>**JURY TRIAL DEMANDED**</u> |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff Cori-Schubert De Cori Revocable Trust brings this Class Action Complaint against Defendants HASelect-Waterford LLC, Griffin Capital Management LLC, Griffin Asset Management LLC, Michael Griffin, and Marcum LLP. by and through Plaintiff's undersigned counsel.  Except for its own acts, which are alleged based on knowledge, Plaintiff alleges the following on information and belief based upon the investigation by Plaintiff's counsel, including a review of documents produced by Defendant Marcum LLP in a previous lawsuit, reports and correspondence furnished to Plaintiff, news articles, media reports, and other publicly available information.  Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This action arises from a systematic scheme to defraud investors in a life settlement fund (Defendant HASelect-Waterford LLC, hereinafter referred to as "Waterford" or  the "Fund")

through manipulation of discount rates used to value the Fund's investment portfolio of life insurance policies, inflating the portfolio's purported value and thereby enabling extraction of excessive fees that are calculated based on a percentage of the reported gains and net asset value ("NAV") of Waterford.

2.      From 2017-2024, Defendant Griffin Asset Management LLC ("GAM"), Waterford's external advisor owned and controlled by Defendant Michael Griffin ("Griffin"), extracted for itself and affiliates approximately $11.5 million in Management, Subadvisory and Platform fees from Waterford (21% of the $54.4 million in investor contributions).  Additional fees charged in 2025 and 2026 have not yet been reported.

3.      GAM collected these exorbitant and inflated fees while concealing the Fund's true financial condition over a period of years, and has failed to liquidate the Fund even though Waterford announced on December 28, 2021 that it would begin an orderly wind-down.

4.      GAM has continued to collect fees throughout the extended period since December 2021, while Waterford shows no signs of completing its wind-down and liquidation.

5.      After purchasing life insurance policies for Waterford's portfolio at a given price, the Griffin Defendants (as defined below), through GAM, then immediately and systemically marked up the value of the insurance policies and carried them on Waterford's books at values well above the policies' true market value.

6.      Once the Fund stopped raising capital, Waterford's returns collapsed because there were no new policies to mark up and generate additional "profits".  This phenomenon is evidenced by the Fund's decreases in NAV since 2022.

7.      Inflating the values of policies held by the Fund upfront also had the effect of consistently showing attractive monthly "returns" that attracted investors, who were unaware that

Waterford's purported investment returns were largely based on inflated unrealized gains resulting from its overvaluation of its policy portfolio, and by-and-large not from actual gains from sale of policies in the market or maturing policies that generated cash returns.

8.    As a result of the Griffin Defendants' causing the Fund to carry its policy portfolio on its books at artificially inflated values, Waterford: (a) was depleted of funds by paying fees to GAM and the Fund's subadvisors that exceeded the fees that would have been due had the Fund's books reflected the policy portfolio's true value; and (b) is now unable to sell the policies for the inflated values it has claimed they are worth.

9.    Defendant Marcum LLP ("Marcum") was Waterford's auditor at relevant times until 2025.

10.    Marcum served as independent auditor for fiscal years 2017 through 2023, issuing unqualified audit opinions each year despite receiving explicit written notice from the Fund's life settlement valuation firm, Lewis & Ellis ("L&E"), throughout the audit period that L&E utilized defined portfolio assumptions (including discount rates) consistent with the approaches selected by the Fund's management in reaching its valuation determinations.

11.    The fraud perpetrated against Waterford and its investors was thus enabled by Marcum's failure to challenge management's self-interested valuation of its policy portfolio, carried out by L&E utilizing defined portfolio assumptions (including discount rates) consistent with the approaches selected by the Fund's management.  Marcum continued to issue unqualified audit opinions attesting to the accuracy of the Fund's reported financial results, despite significant red flags raised by the valuation information provided by, and valuation methodology utilized by, L & E.

12. In December 2021, after extracting millions in fees, Waterford's management suspended all redemptions and announced a wind-down of the Fund, trapping investors' capital.

13. More than four years later, the fund remains substantially unliquidated, having distributed (since the initial gating in September 2021) only $5.679 million of the $54.4 million contributed as of then (*i.e.*, a yearly average of 1.8% of the $70,014,980 NAV as of December 31, 2021.

14. By July 2025, Marcum had resigned without explanation, the Fund's subadvisor and portfolio manager (Christopher Erwin, and his firm Global Capital Consulting ("GCC")) had departed with no replacement, and the Fund had been declared "Distressed" by Forge Trust Co., an IRA Custodian for the fund.

15. Shortly thereafter, the Fund's Administrator (NAV Consulting Inc.) was fired or resigned (actual reasons were not disclosed to investors) and replaced with Formidium Corp., which produces periodic statements without auditor support.

16. The Fund now operates without auditor oversight, professional portfolio management, or functioning governance.

17. The Fund now operates as a rudderless ship, with investors' funds tied up and continuing to be depleted by GAM's collection of fees. Plaintiff now seeks relief on behalf of itself and approximately 150-200 investors who invested over $54 million in Waterford.

## II.    PARTIES

18. Plaintiff Cori-Schubert De Cori Revocable Trust ("Plaintiff") is a revocable trust for the benefit of Annette Schubert De Cori and Mauricio Cori who are domiciled in California and made net contributions of $850,000 into Waterford between 2017 and December 31, 2021 (supposedly valued at $1,096,227 on that date).

19.    Plaintiff has received redemptions of $88,347 in the four years since the December 31, 2021 wind-down began, with over $760,000 of this investor's net contributions still trapped.

20.    Defendant HASelect-Waterford LLC (defined above as "Waterford" or the "Fund") is a Delaware LLC having its principal place of business in Chicago, Illinois.

21.    The Fund is in wind-down but remains substantially unliquidated more than four years after suspending redemptions.

22.    Defendant Griffin Capital Management LLC ("GCM") is a Delaware LLC with principal place of business in LaGrange, Illinois. GCM is sole managing member of Waterford with exclusive authority over all material decisions. GCM's compensation is based on NAV percentage, creating incentive to inflate NAV.

23.    Defendant Griffin Asset Management LLC ("GAM") is an Illinois LLC with principal place of business in LaGrange, Illinois whose members are citizens of and domiciled in Illinois.

24.    As Waterford's external advisor, GAM determines discount rates used to value the portfolio. GAM is compensated through NAV-based fees.

25.    Defendant Michael Griffin ("Griffin") is the principal of GCM and GAM. Griffin is an Illinois citizen and domiciled in Illinois who personally benefited from millions in fees and redeemed his investment at inflated NAV before problems emerged. GCM, GAM and Griffin are sometimes referred to collectively as the "Griffin Defendants".

26.    Defendant Marcum is a New York LLP headquartered in New York. Marcum audited Waterford from 2017-2023, issuing false audit opinions.

5

27.    Marcum resigned in July 2025 shortly before August, when the 2024 tax returns and first-half 2025 Investor Statements revealed three-and-a-half consecutive years of ever increasing losses.  Marcum never opined on its audit of the Fund's 2024 financial statements.

### III.    JURISDICTION AND VENUE

28.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) (CAFA) because (a) there are 100 or more class members; (b) there in an aggregate amount in controversy exceeding $5 million; and (c) minimal diversity is present because at least one plaintiff and one defendant are citizens of different states.

29.    Venue is proper because Marcum's principal place of business is in this District and substantial conduct and acts and practices complained of occurred here, including audit work and issuance of false opinions from New York.

30.    This Court has personal jurisdiction over all Defendants. Marcum is headquartered in New York. GCM, GAM, and Griffin transacted business in New York, and availed themselves of New York jurisdiction through their relationship with Marcum and distribution of materials to New York investors.  The LLC agreement for the Fund also provides that the parties thereto "irrevocably consent to the exclusive personal jurisdiction of the federal and state courts located in the State of New York, Count of Westchester."

### IV.    FACTS COMMON TO ALL COUNTS

#### A. Fund Structure and Investment Strategy

31.    Waterford is a Delaware LLC formed as a series of HedgeACT Select LLC. Waterford invests in life settlement policies—life insurance policies purchased from insureds who no longer want the coverage.

32. Life settlement funds generate returns by: (a) collecting death benefits when insureds die; and (b) selling policies to third parties. Both require paying ongoing premiums.

33. The fundamental valuation question is: What is the present value of a policy that will pay a death benefit of $X at an uncertain future date? The answer depends on (a) life expectancy and (b) discount rate.

34. The discount rate is the most critical valuation input. A small change produces large changes in value. Reducing discount rates by 5 percentage points (e.g., from 15 to 10 percent) can increase valuations by 18 percent. A reduction of 8 percentage points (e.g., from 18 to 10 percent) can result in a 28% increase in valuation.

**B. Governance Structure**

35. GCM is the sole managing member of the Fund, with exclusive authority over all decisions, including valuation methodologies, service providers, fees, distributions, and redemptions.

36. The Operating Agreement grants GCM sole discretion to determine NAV, which can be defined as the per-share market value of an investment fund, calculated as total assets minus liabilities. NAV per share or unit is simply the Fund's overall NAV, divided by the number of shares or units. NAV is crucial because it determines: (a) purchase price for new investors; (b) redemption price; (c) management fees; and (d) reported performance.

37. GCM delegated discount rate determinations to affiliate GAM. GAM's compensation—based on a percentage of NAV—created an obvious conflict of interest: the higher the NAV, the higher GAM and GCM's fees. This conflict gave the Griffin Defendants an incentive to artificially suppress discount rates used to calculate the value of Waterford's policy portfolio, which in turn inflated the Fund's NAV, and the fees payable to the Griffin Defendants.

38.    Neither the Operating Agreement nor any governance document imposed constraint, oversight, or independent check on management's discount rate determinations.

39.    The Operating Agreement required annual audits by an independent certified public accounting firm (Master LLC Agreement § 2.6(b)). This audit requirement was the primary safeguard against self-dealing and valuation manipulation. The Operating Agreement, § 2.6(b), required as follows: "The Managing Member shall cause to be prepared and distributed to each Member as soon as practicable following each Fiscal Year an annual financial statement prepared and audited by an independent certified public accounting firm."

### C.  The Fraudulent Valuation Methodology

### 1.  Market Evidence: Discount Rates of 15 to 18 Percent (and higher)

40.    Market participants purchasing life settlement policies during 2017-2021 consistently used implied discount rates of 15-18 percent and often >18%, as evidenced by prices Waterford itself paid when acquiring policies from third parties.

41.    When Waterford purchased policies from third parties during 2017-2021, the purchase prices implied discount rates of approximately 15-18 percent or more based on death benefits and life expectancies. These purchase prices provided contemporaneous market evidence of appropriate valuation of the policies.

### 2.  Defendants Applied 10-12 Percent Rates

42.    Despite actual knowledge that discount rates implied by the purchase prices were 15 to >18 percent, Defendants systematically applied 10-12 percent discount rates immediately after purchase, for NAV purposes.

43.    The deviation was not occasional but systematic, consistent, and generally applied across Waterford's portfolio from 2017 to 2021.

44.     This pattern occurred broadly across the entire portfolio

8

45.     Facts necessary to this complaint were recently disclosed by the Fund's auditor, Marcum, in response to a document production request in a related action involving a separate fund wherein the auditor produced what appears to be a complete set of audit workpapers for all of Griffin's funds.  The documents produced (the "Marcum-Griffin production") reveal that a discount manipulation and upfront markup scheme operated across, both, the Waterford portfolio, and the Morpheus LIFE Fund ("MLF") portfolio.  (MLF is a life settlement fund also managed by the Griffin Defendants and audited by Marcum).

46.     For Waterford, the Marcum-Griffin production documents show that a subset consisting of 126 policies open as of December 31, 2020, referred to as the "WG" policies, had a total purchase cost of $22,620,553 and a valuation by the end of the year of purchase (2019 or 2020, depending on each policy) of $29,830,836, an aggregate intra-year markup of $7,210,283 (31.9%).  Of these 126 policies, 124 (98%) show positive markups and two had negative markups. Also, the average per-policy (*i.e.*, not dollar-weighted) intra-year markup was 39.4%, revealing that smaller policies received higher markups.

47.     For MLF, the Marcum-Griffin production documents show that for the 28 policies purchased in 2019 and open as of December 31, 2019, the acquisition cost was $5,752,357 and the valuation by end of 2019 stood at $7,290,650, an aggregate intra-year markup of $1,538,293 (26.7%). The average per-policy (not dollar-weighted) intra-year markup was 34.5%, revealing that smaller policies received higher markups.

48.     Among the Waterford policies referenced in ¶ 46, the largest individual intra-year markups included multiple individual policies with enormous markups including the following: (a) WG025 (purchased 2019-10-22 for cost of $140,000; value on 2019-12-31: $319,948 (128% intra-year change); (b) WG034, purchased 2019-11-27 for cost of $41,699; value on 2019-12-31:

$92,871 (122.7% intra-year change); (c) WG126, purchased 2020-10-04 for cost of $330,750; value on 2020-12-31: $590,785 (78.6% change); (d) WG035, purchased 2019-11-27 for cost of $55,787; value on 2019-12-31: $98,918 (77.3% change).

49.     The intra-year increase of 31.9% in the WG Waterford open policies as of December 2020 closely approximates an immediate (intra-month) markup, of circa 30% on policy acquisition. The Fund's valuation practices in which some life settlements seemingly as much as doubled in value in a period of a month simply by virtue of now being on Waterford's books,  were generated entirely by applying discount rates below market pricing levels, inflating the reported NAV and thereby increasing the fees extracted by the Griffin Defendants.

50.     The significance of inflated valuations of this magnitude across the overall portfolio cannot be overstated.  The estimated 30% day-one markup in value on these policies means that for every dollar actually spent to acquire the WG Waterford policies, the Griffin Defendants recorded approximately $1.30 in purported value on the Fund's balance sheet—generating, in the case of the 126 WG policies, approximately $6.8 million in phantom asset appreciation on the day of purchase.

51.     This artificial inflation of asset values also inflated the Fund's reported NAV, based upon which management and performance fees were assessed, compounding the harm to investors with each quarterly fee extraction.

52.     In many cases, Waterford purchased policies from other investment funds in groups.  When a group of life settlement policies is bought and sold on the secondary market, by sophisticated parties, the purchase price in an arms' length transaction constitutes *prima facie* evidence of the market value of the policies.

53.     Regardless of the source of the policy, whether purchased from an unsophisticated individual unfamiliar with prevailing market prices, or on the open market from another experienced market participant, Griffin consistently marked up the value of its policies after purchase.

54.     For example, on July 10, 2019, Griffin on behalf of Morpheus LIFE Fund, LLC purchased seven policies from ALIR, LLC (operated by Chrisopher Erwin, the very same individual performing the role of subadvisor and portfolio manager for MLF and Waterford) for a total price of $749,295.35.  Within a couple months of buying the policies from a sophisticated market participant Griffin valued the policies at $1,032,910. From the Incentive Allocation fee alone, Griffin and Erwin would have each immediately profited from this "gain" by 10% of the markup, that is, $28,361, or $56,722 collectively.

55.     These purchase prices, reflecting arms-length market transactions, consistently implied discount rates of 15-18% (and often greater), yet the Griffin Defendants immediately revalued these same policies using the 12.25% base discount rate, generating the day-one markups documented above.

56.     Marcum's audit workpapers confirm that L & E applied a base market discount rate of 12.25% with policy-by-policy adjustments yielding rates from 8% to 18% and that this rate remained unchanged from 2015 through 2022—seven consecutive years.

57.     L&E utilized the 2015 Valuation Basic Tables (2015 VBT) with a 0.50% mortality improvement assumption—also unchanged for seven years.

58.     By 2022, the Society of Actuaries had published updated 2020 VBT tables, yet neither management nor Marcum evaluated whether updates should apply. The use of stale

11

assumptions year after year, without any documented reassessment, is itself a red flag of valuation manipulation that Marcum was obligated to investigate under AU-C 540.

### D.  The False Independent Validation Representations

59.    From 2017 through 2023, Defendants represented to investors that portfolio valuations were independently validated by L&E, a Dallas-based actuarial firm.  For example, in an audit report for the year ended December 31, 2023, later furnished to investors, Marcum indicated that "the base discount rate used for this valuation is 12.50% and is based on review and analysis of several sources of market data" and was "developed by the Valuation Firm" (*i.e.,* L&E).

60.     Marcum's audit reports also described L & E as a "third-party" independent valuation entity: "The Managing Member engaged a third-party valuation firm Lewis & Ellis (the "Valuation Firm") to perform a fair value analysis and the applied assumptions and methodology which are described herein."  Marcum also describes L&E's discounted cash flow valuation method as follows: "The income approach uses valuation techniques to convert future values (i.e. cash flows, or earnings) to a single present amount (discounted)... [t]he measurement is based on the value indicated by current market expectations about those future amounts and is recommended by the Valuation Firm and is evaluated and approved by the Series." (P. 9 of the 2023 Audit Report)

61.    Based on the actual course of dealing, Marcum knew these representations were false, and that L&E did not devise the Fund's valuation methodology.  Marcum was well aware that the operative discount rates applied by L&E were the same discount rates provided by the Griffin Defendants, and utilized by the Griffin Defendants in re-calculating the value of the Fund's policy portfolio.

62. Throughout the audit period from 2017 through 2023, L&E also provided explicit written disclaimers about the limitations of its role in valuing the Fund's assets, which disclaimers were not provided to investors. In questionnaire responses to audit inquiries (including documents bates-stamped MARCUM-GRIFFIN_00008639, _00004209, _00013094, _00018733, _00030708, and _00035271), L&E, when asked "Provide support for the discount rate and mortality assumptions used at the time of purchase", explicitly stated: "We only provide the official value for the policies after they have been acquired and are not involved in the discussions as to which policies to purchase or any of the analysis surrounding the policy dynamics at time of purchase and the potential health conditions of the insured." This language makes clear that L&E does not independently evaluate the discount rates implied by purchase prices, mortality assumptions, or policy purchase decisions.

63. In addition to these questionnaire responses, L&E's annual valuation reports provided to Waterford and Marcum each year (including reports bates-stamped MARCUM-GRIFFIN_00000774, _00004193, _00008628, _00013079, _00018717, _00030695, and _00035253) contained comprehensive "Disclosures and Limitations" sections with eight categories of disclaimers that explicitly:

   a. Disclaimed responsibility for third-party reliance ("L&E assumes no responsibility for interpretation of or reliance on this report by any third party unless L&E has provided, in advance, written consent");
   b. Stated values were "not guaranteed" ("the values based on projected cash flows are not guaranteed");
   c. Disclaimed any warranty of actual performance ("L&E does not warrant, nor do we offer any assessment as to whether the process applied herein will be validated by actual performance");
   d. Characterized values as "only estimates" ("the policy values listed in this report are only estimates");
   e. Characterized discount rates as "only guides" ("such rates are only guides in calculating portfolio value and rates may change from one period to the next");
   f. Disclaimed performing data audits ("have not completed a formal audit of data… L&E does not guarantee or confirm the completeness or accuracy of the data");

13

g.  Stated L&E was not an underwriter ("L&E is not an underwriter and has not received or reviewed any medical data"); and

h.  Stated L&E offered "no opinion" on life expectancy accuracy ("offer no opinion as to their completeness or accuracy").

i.  Disclaimed its qualification as "independent from the Fund" in setting discount rates ("The market value discount strategy defined by Lewis & Ellis, with assistance from the Fund, reflects current market value of policies and provides a basis upon which investment into and redemption from the fund can be transacted consistent with the current market rate for policies acquired or sold.")

64.     The cumulative effect of these disclaimers—provided year after year throughout the audit period—was to communicate that L&E did not devise or independently validate the valuation methodology that it applied, and instead L&E utilized defined portfolio assumptions (including discount rates) consistent with the approaches selected by the Fund's management in reaching its valuation determinations.

65.     According to persons knowledgeable concerning L&E's business practices and the events at issue, L & E does not provide fund managers the discount rates to use in valuing life settlements. The scope of its work performed for Waterford was limited, as discussed in ¶¶ 66-70, *infra*. Scott Gibson, a principal at L&E, declared the following in a July 2024 deposition pertaining to a separate matter: "this is what I get asked all the time relative to discount rates amongst auditors. And to date, they have accepted this as okay. For the most part, in my valuation of funds, I use the discount rate that is provided to me by the fund manager. They will typically give me some one or two-page writing on how they arrive at their discount rates based on this market, that market, their buys, their sales. That is -- goes into the documentation." Mr. Gibson also testified as follows: "Okay. So, most of my clients, they will vary their discount rates from time to time as the market changes, of which I typically adhere to."

14

66.     The scope of L&E's work was narrowly limited to performing actuarial calculations based on policy data, longevity estimates, and assumptions provided exclusively by the Fund and Michael Griffin, through GCM.

67.     Further, L&E only received and utilized the documents and information that Griffin chose to provide; on information and belief , L&E had no access to or knowledge of any other data, and it conducted no independent investigation, verification, or due diligence into the Fund's operations, policy acquisitions, or underlying assumptions.

68.     Finally, discount rates were applied using a floating base rate of 12.25%, but all adjustments, including risk components, debits/credits, and policy-specific variations, were derived from inputs supplied by Griffin and the Fund

69.     In summary, L&E did not recommend, develop, independently assess, or verify discount rates or any other assumptions; it merely applied the rates as directed so long as they "passed the smell test."

**E.  Contemporaneous Market Evidence**

70.     Throughout 2017-2021, Defendants possessed contemporaneous market evidence that prevailing prices for acquisition of life insurance policies in the secondary market consistently implied a 15 to >18  percent discount rate.  This evidence included: (a) Waterford's own acquisition prices; (b) industry publications reporting market transactions; (c) broker quotes for comparable policies; and (d) direct market observations.

71.     This contemporaneous evidence was not obscure. Defendants possessed it directly through their own acquisitions and regular market participation.

72.     The availability of contemporaneous evidence defeats any defense that Defendants made erroneous judgments or that problems were only apparent in hindsight. Defendants knew

during 2017-2021 that the marked-up values at which Waterford carried policies on its books deviated materially from market evidence of fair value.

### F. Griffin's Redemptions

73. Griffin personally invested in Waterford and held membership interests during the fraud period. According to audit reports, Griffin (referred to as the "Managing Member") invested $78,123 in 2020 and $500,485 in 2021.

74. Subsequently, the 2022 Audit Report showed that the Managing Member had a redemption of $450,000, compared with redemptions for all non-managing members totaling only $237,589 (in other words, Griffin's listed redemption was exorbitant, percentage-wise, compared to non-managing members'). When investors inquired (via newsletter Q&A), Defendants responded by changing the narrative: the transfer was now reclassified as a withdrawal of "crystallized Incentive Allocation fees".

### G. The Systematic Multi-Year Fraud

75. The discount rate manipulation was systematic, consistent, and pervasive across Waterford's portfolio over the four-and-a-half years from July 2017 to the December 2021 start of wind-down.

76. In each quarterly reported NAV calculation, the Fund applied the same fraudulent methodology: artificially suppressed discount rates of 10-12 percent despite market evidence of 15 to >18 percent.

77. This consistent pattern across these years and the vast majority of the portfolio demonstrates deliberate, intentional conduct rather than negligence.

78. Across the almost-nine-year span of the Fund (2017 to the present), the sequence of the scheme was: (a) take contributions from investors attracted by inflated returns and

statements of "independent third-party valuation"; (b) purchase policies and record artificially high unrealized gains; and (c) charge quarterly performance fees (for management and Subadvisors) amounting to 20% of purported "gains" and 2% of NAV.  When investor redemption requests began to mount, requiring real dollars to be disbursed, the Griffin Defendants then suspended all redemptions and announced a wind-down of the Fund, trapping investors' capital.

79.    Subsequently since December 2021, the Griffin Defendants have continued extracting fees for many years, at the expense of the Fund and its investors.

## H. Marcum's Audit Failures

### 1. Marcum's Role

80.    Marcum served as independent auditor for Waterford for fiscal years 2017-2023 inclusive, issuing unqualified audit opinions representing that financial statements presented Waterford's position fairly in all material respects, in accordance with GAAP, and that audits were conducted in accordance with PCAOB standards.

81.    In July 2025 Marcum resigned abruptly, without explanation, and without producing the 2024 audit report; in fact, Marcum also resigned abruptly from their audit engagements at the same time from all of Griffin's funds, including Waterford, HASelect-Medical Receivables Litigation Finance Fund International SP; Medical Receivables Litigation Finance Fund; Morpheus LIFE Fund LLC, HedgeACT Series LLC funds Morpheus Absolute Alpha LLC, Morpheus Absolute Alpha Select Opportunities Fund LLC, at least six separate fund entities, all of which are in a wind-down or liquidation stage, and/or under distress.

82.    GAAP fair value standards (ASC 820) require measurements reflect "market participant assumptions" and use "observable market inputs." Discount rates deviating 5-8 percentage points from observable market evidence violate ASC 820.

17

83.     PCAOB standards require auditors to: (a) obtain sufficient appropriate evidence; (b) maintain professional skepticism; (c) evaluate management's estimates; (d) investigate fraud risks; and (e) obtain reasonable assurance statements are free of material misstatement.

84.     Marcum's role was particularly critical given governance granting management exclusive control over valuations with obvious conflict. The audit was the only independent check.

### 2.  Explicit Red Flags Received by Marcum

85.     Marcum received explicit documentary evidence from L&E that should have alerted any competent auditor to the fraud.

86.     Marcum's audit reports described L & E as a "third-party" independent valuation entity.

87.     Throughout the audit period from 2017 through 2023, Marcum received explicit written disclaimers from L&E in multiple forms.

88.     First, Marcum received L&E's questionnaire responses (*e.g.,* MARCUM-GRIFFIN_00008639) explicitly stating L&E was "not involved in the discussions as to which policies to purchase or any of the analysis surrounding the policy dynamics at time of purchase" and did not evaluate discount rates.

89.     Second, Marcum received L&E's annual valuation reports (MARCUM-GRIFFIN_00000774, _00004193, _00008628, _00013079, _00018717, _00030695, and _00035253), each of which contained comprehensive "Disclosures and Limitations" sections explicitly: disclaiming third-party reliance ("L&E assumes no responsibility for interpretation of or reliance on this report by any third party"); stating values were "not guaranteed"; disclaiming warranty of actual performance; characterizing values as "only estimates"; characterizing discount rates as "only guides" that "may change from one period to the next"; disclaiming data audits

("have not completed a formal audit of data"); and stating L&E was not an underwriter and offered "no opinion" on data accuracy. These disclaimers were addressed to "auditors" and were provided directly to Marcum year after year.

90. A competent auditor receiving these explicit and comprehensive disclaimers year after year would immediately recognize that:

a. Management's representations of "independent validation" were false;

b. L&E utilized defined portfolio assumptions (including discount rates) consistent with the approaches selected by the Fund's management in reaching its valuation determinations;

c. L&E performed no audit of underlying data and provided no guarantee of data accuracy;

d. L&E assumed no responsibility for third-party reliance on their work;

e. The values were conditional, non-guaranteed "estimates" rather than validated fair values; and

f. Comprehensive independent analysis by the auditor was required. The disclaimers communicated that L&E's work did not constitute independent validation and that the auditor could not rely on L&E's work without conducting independent verification.

91. Upon receiving these disclaimers annually from 2017 through 2023, a reasonable auditor would have:

a. Obtained independent market data regarding appropriate discount rates;

b. Tested management's discount rate selections against observable market evidence (including Waterford's own acquisition prices, which implied 15 to >18 percent rates); Challenged the 5-8 percentage point systematic deviation from market rates;

c. Investigated why management was using rates that deviated materially from rates implied by the Fund's own acquisition prices;

d. Documented skeptical analysis of management's self-interested valuations;

e. Independently verified the accuracy of underlying life expectancy data; or

f. At minimum, documented comprehensive analysis supporting the reasonableness of discount rates.

92.     Marcum did none of these. Instead, Marcum continued issuing unqualified opinions for five more years (2019-2023) while documenting no independent analysis of discount rate reasonableness.

### 3. Marcum's Systematic Failures

93.     Marcum failed to gather sufficient information to support its audit opinions regarding discount rate reasonableness—the most material audit area.

94.     As far as the record discloses, Marcum obtained no market data regarding appropriate rates, performed no comparison to industry benchmarks, performed no testing against observable evidence (Waterford's acquisition prices), and documented no analysis.

95.     Despite multiple red flags (conflict of interest, L&E's disclaimers, absence of documentation, systematic pattern of declaring substantial unrealized gains shortly after purchases), Marcum accepted management's representations without question and documented no skeptical inquiry.

96.     Marcum failed to evaluate whether management's estimates were reasonable, properly supported, or consistent with observable market data.

97.     Despite obvious fraud risk indicators, Marcum documented no fraud risk assessment regarding discount rates, designed no additional procedures, and performed no forensic testing.

98.     Marcum's performance was so deficient that it amounted to "no audit at all." Marcum performed no substantive testing of the most material audit area despite obvious fraud risks and explicit contradictory evidence.

20

99.     Marcum's audit index for HedgeACT Series LLC (2020) required the team to obtain and review a memo from management documenting valuation procedures. The workpaper shows this step was marked "Not deemed necessary." (MARCUM-GRIFFIN_00008896.)

100.     Marcum was required to analyze the practical expedient under ASU 2009-12 for fair value measurements. Marcum's response: "N/A—Practical expedient not prohibited"—which is internally contradictory and demonstrates fundamental misunderstanding of the accounting standard. (MARCUM-GRIFFIN_00008896.)

101.     Marcum's valuation memos for 2019, 2020, 2021, and 2022 each document that Marcum independently calculated higher net present values than L & E reported. (MARCUM-GRIFFIN_00087735; _00004211; ; _00018731; _00035268.) Under AU-C 620.19, when the auditor's independent calculation yields a different result from the specialist, the auditor must investigate the difference. Marcum concluded each year that L&E's lower valuation was "reasonable" without performing any reconciliation or investigation of the discrepancy.

102.     Marcum used average premiums rather than actual policy-by-policy premium projections in its valuation analysis. (MARCUM-GRIFFIN_00000785; _00004211.) No analysis of this methodological divergence was performed.

103.     Telephone verification of electronic confirmations was waived because "Marcum audit of investee located in binder." (MARCUM-GRIFFIN_00008896.) This is a circular justification: Marcum relied on its own prior work to justify not performing current verification.

104.     The 2015 VBT mortality table, 0.50% improvement factor, and 12.25% base discount rate were used without change from 2015 through 2022. (MARCUM-GRIFFIN__00087735; _00004211; _00018731; _00035268.) No annual re-validation was

documented. A competent auditor would question why assumptions remained static for seven years across a changing economic and mortality environment.

105. The only documented internal control over the most material item on the financial statements was: "Fund's management approves all significant estimates which relates to the valuation." (MARCUM-GRIFFIN_00007958.) No testing of whether this control was actually operating was documented.

106. In the client acceptance documentation, Marcum described the offshore feeder fund Level 3 investments as "offshore feeder funds into onshore entities that we audit." (MARCUM-GRIFFIN_00035340.) This dramatically understated the true complexity of the fund-of-funds structure and the associated valuation risk.

107. Partner review documentation confirmed professional skepticism was "communicated" to the engagement team, but no evidence of what specific fraud risk discussions occurred regarding the valuation discrepancies between Marcum's own calculations and L&E's.

108. The Marcum-Griffin production contains 291 management assessments and materiality work sheets, of which 26 are Waterford-specific. In these letters, management represented: (a) no fraud, material errors, or illegal acts (e.g., MARCUM-GRIFFIN_00000048); (b) fair value properly determined; (c) related party disclosures complete (e.g., _00000001). To the extent these representations endorsed discount rates below market, they were false.

109. Marcum's audit failures extended beyond Waterford to other Griffin-managed funds. In 2020, Marcum (Cayman) issued an unqualified audit opinion for the HASelect-FTM Medical Receivables Litigation Finance Fund SP as of December 31, 2019, despite the fund's valuation being based entirely on Level 3 (unobservable) inputs and management's assumption of "zero" probability of default on the fund's sole $11.2 million loan investment to Infinity Capital

Management, Inc. (Audited Financial Statements, HASelect-FTM Medical Receivables Litigation Finance Fund SP, December 31, 2019 (Marcum Cayman, April 27, 2020, pp. 7, 12.) An assumption of zero default probability for any loan is inherently unreasonable and demonstrates that management's fair value determinations lacked any reasonable basis, yet Marcum approved it without challenge.

110.    On December 28, 2021—before the 2022 fiscal year began—Waterford suspended all redemptions after receiving approximately $16.8 million in redemption requests for the March 31, 2022 withdrawal date, announced it would no longer accept new subscriptions, and commenced a wind-down estimated to take 36 to 60 months. (Audited Financial Statements, HASelect-Waterford LLC, December 31, 2022 (Marcum LLP, April 5, 2023), p. 22.) Despite auditing a fund in active liquidation with members unable to redeem, Marcum issued an unqualified audit opinion on April 5, 2023 with no going concern qualification, no emphasis-of-matter paragraph highlighting the redemption suspension, and no disclosure that the Fund's business model had fundamentally ceased. This failure to appropriately qualify the opinion or highlight the redemption gate in the audit report constitutes a material omission that misled investors about the Fund's operational status.

111.    The 2022 Waterford audit disclosed a sensitivity analysis showing the portfolio's fair value at various discount rates: $65,995,843 at 10%, $61,118,671 at 12%, $60,743,068 at the "market rate" of 12.25% (the reported value), $56,912,009 at 14%, $53,252,078 at 16%, and $50,055,711 at 18%. (Audited Financial Statements, HASelect-Waterford LLC, December 31, 2022 (Marcum LLP, April 5, 2023), p. 11.) A mere 5.75 percentage point decrease in the discount rate, *e.g.,* from 18% to 12.25% inflates the portfolio value by approximately $10.7 million (from $50.056 million to $60.743 million, a 21.3% increase).

112.    In 2022, despite Waterford generating a net loss of $264,405, the Griffin Defendants extracted $2,098,731in fees and expenses from the Fund: $714,171 in management fees (to GAM), $635,797 in subadvisory fees (to GCC), $337,492 in platform fees (to GAM), and $411,271 in Administrative/Professional & Other fees. (Audited Financial Statements, HASelect-Waterford LLC, December 31, 2022 (Marcum LLP, April 5, 2023), pp. 4, 23.)

113.    Total expenses of $2,098,731 represented a 3.09% expense ratio on members' equity, while the Fund generated zero investment income.

### 4. Waterford's Reported "Profits" and the "Gains" the Griffin Defendants' Fees were Based on Fabricated Valuations

114.    From the Fund's inception in July 2017 through December 31, 2018 (18 months), Waterford purchased 55 policies at a cost of $12,322,851 and immediately marked their values up by $2,510,139, an instant unrealized gain of 20.4%, resulting in a year-end valuation of $14,832,990. (Audited Financial Statements, HASelect-Waterford LLC, December 31, 2018 (Marcum LLP, May 16, 2019), pp. 3, 6, 16.)

115.    This immediate markup on brand-new acquisitions proves that the valuation methodology was designed to generate artificial gains from day one. The 2018 audit shows total net income of $1,743,185, composed entirely of: (a) unrealized appreciation of $3,512,932, offset by (b) premiums paid of $1,002,792, and (c) expenses of $766,955. (*Id.* at p. 4.) Not a single dollar of realized gains from actual policy sales or maturities is reflected in the Fund's reported net income. The Fund thus reported "gains" or "profits" comprised entirely of unrealized appreciation to investors, demonstrating that the Griffin Defendants' valuation methodology was designed to manufacture paper gains to attract capital and generate inflated fees, not to reflect economic reality.

116.    By December 31, 2020, the portfolio cost basis had grown to $31,703,706 while fair value reached $44,713,686—a 41.0% markup. (Audited Financial Statements, HASelect-

Waterford LLC, December 31, 2020 (Marcum LLP, April 20, 2021), p. 3.)  The markup percentage doubled from 20.4% (2018) to 41.0% (2020) despite Defendants' purportedly using an identical valuation methodology.

117.    As Defendants' scheme grew more brazen, total Management, Platform, and Incentive Allocation fees extracted from Waterford by the Griffin Defendants increased from $644,000 over 18 months (July 2017–December 2018), or $429,333 when annualized, to $2,435,176 in 2020 alone—a 567% increase in annual fees as the Fund grew. (2018 Audit p. 4; 2020 Audit p. 4, 5.)

118.    The annualized fee burden as a percentage of members' year-end equity rose from 2.6% (that is, $429,333 / $16,425,027) in 2018, to 4.2% (that is, $2,435,176 / $57,792,860) in 2020.

119.    Despite growing assets under management (which typically allow for economies of scale and lower fee percentages), the percentage of assets under management extracted as fees and expenses actually increased as Waterford grew.

120.    Higher valuations meant higher reported NAV, which meant higher management fees (calculated on NAV), higher incentive allocations (calculated on gains), and the ability to raise more capital (because reported returns appeared strong).

### 5.  SEC Enforcement Actions

121.    During 2017-2022, the SEC imposed a $10 million penalty on Marcum for systemic quality control failures affecting 85% of audits examined during this period.

122.    The SEC found that Marcum partners repeatedly: (a) failed to obtain sufficient appropriate audit evidence; (b) ignored contradictory evidence; (c) failed to investigate fraud risks; (d) backdated documentation; and (e) engaged in inadequate supervision.

123. The SEC found Marcum violated PCAOB standards including those requiring response to fraud risks and obtaining sufficient evidence—the same standards Marcum violated in Waterford audits.

124. These systemic failures during 2017-2023 were not limited to specific audits but reflected firm-wide quality control failures affecting all audits, including Waterford.

### 6. Plaintiff's Reliance on Marcum's Audit Opinions

125. Marcum's audit reports for fiscal years 2017 through 2023 were signed by Marcum and expressly addressed to Waterford and its members.

126. These signed audit opinions were included in annual report packets and investor communication packages sent to existing and prospective members.

127. The principals of Plaintiff relied on Marcum's signed audit opinions before making their $850,000 investments in 2017-2021.

128. Plaintiff took comfort from Marcum's express statements that Waterford's financial statements "present fairly, in all material respects, the financial position of HASelect-Waterford LLC in accordance with accounting principles generally accepted in the United States of America" and that Marcum's audits "were conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States)."

129. These representations by Marcum were material to Plaintiff's investment decisions because they provided purportedly independent, expert assurance that management's self-interested valuation determinations complied with objective accounting standards and were subject to appropriate professional scrutiny.

130. Moreover, and critically, these representations gave investors a certain (yet false) sense of security during the early post- wind-down period (January 2022 – June 2023). Plaintiff

expected from the Audit Reports that the post- wind-down valuation was fair and would enable management to sell assets and substantially wind down within four years.

131.    The Operating Agreement (Master LLC Agreement § 2.6(b)) required annual audits specifically to protect members' interests and to satisfy SEC Investment Advisers Act custody rule requirements (Rule 206(4)-2), which are designed to benefit and protect investors.

132.    Each year, Waterford provided Marcum with current investor lists, capital account statements, and Schedule K-1 tax information, so Marcum knew the precise, finite group of approximately 150-200 investors who would receive and rely on its audit opinions.

133.    Marcum coordinated with Waterford regarding the timing of investor communications and understood that its audit opinions would be enclosed with or incorporated into quarterly reports and annual materials sent directly to members.

134.    Marcum's audit opinions were expressly addressed to Waterford's equity holders (variously styled "to the Members of HASelect-Waterford LLC" in the 2018 and 2020 audits, and incorrectly as "to the Shareholders of HASelect - Waterford LLC" in the 2022 audit—demonstrating Marcum's lack of attention to detail, as LLCs have members, not shareholders), or Marcum otherwise acknowledged that investors would rely on its opinions "to the Members of HASelect-Waterford LLC" or Marcum otherwise acknowledged that investors would rely on its opinions.

## I.    Materiality of False Statements

135. The false statements and omissions alleged herein were material to reasonable investors. The NAV per unit reported in quarterly statements was material because: investors purchasing interests paid prices based on reported NAV (typically normalized to $1.00 per unit); investors evaluating whether to redeem or hold relied on NAV to assess value of their investments;

and a 25–40% overstatement of NAV would substantially alter the total mix of information available to investors and would have been considered important by reasonable investors in making investment and redemption decisions.

136.    Representations to the effect that valuations were independently validated by L&E were material because: independent validation provides critical assurance that management's self-interested valuations are reliable; absence of independent validation means only the conflicted party (management benefiting from higher valuations through higher fees) verified the values; reasonable investors would consider it important to know whether valuations were validated by a truly independent party or merely reviewed by a consultant who disclaimed validation; and the difference between validated and non-validated valuations bearing 25–40% overstatement would be important to reasonable investors.

137.    Marcum's unqualified audit opinions representing that financial statements fairly presented Waterford's financial position in accordance with GAAP were material because: audit opinions provide independent expert assurance of financial statement reliability; investors reasonably rely on audit opinions as indication that financial statements are free of material misstatements.  Equally importantly, Marcum's audit opinions omitted to disclose that the auditor failed to verify the most material valuation assumption (discount rates), ignored L&E's disclaimers concerning its use of defined portfolio assumptions (including discount rates) consistent with the approaches selected by the Fund's management, and performed no substantive testing.  These omissions would have been important to reasonable investors who, relied on the accuracy of Marcum's audit opinions.

## J.  Fee Structure and Calculations

138. GCM received 1 percent of NAV annually, calculated and paid quarterly. Additionally, the Subadvisor Portfolio Manager (initially, Madison Strategic Partners Group LLC,

"MSPG", then replaced shortly after 2019 by GCC / Christopher Erwin) also received 1 percent of NAV. GAM received 0.5 percent for Platform fees. (MARCUM-GRIFFIN_00035579.)

139. GAM received 10 percent of net profits including unrealized gains, calculated based on NAV, known as an "Incentive Allocation fee". The Subadvisor Portfolio Manager also received the same.

140. This fee structure created direct financial incentive to inflate NAV: every dollar of artificial inflation generated $0.01 in annual management fees and approximately $0.10 in incentive allocations.

141. From 2017-2024, Defendants extracted approximately $11.5 million in Management, Subadvisory, and Platform fees from Waterford (21% of the $54.4 million in investor contributions). Additional fees collected in 2025 and 2026 have not yet been reported.

142. Had reported NAV been calculated using true market rates instead of fraudulent 10-12 percent rates, which caused a markup of approximately 30%, NAV would have been approximately 25 percent lower.

143. The excessive fees calculated on fraudulently inflated NAV constitute unauthorized personal gain exceeding contractual authorization.

### K. The 2024-2025 Operational Collapse

144. On August 28, 2025, Waterford distributed Schedule K-1 tax forms to investors for fiscal year 2024. Also distributed (on August 11, 2025), were the Investor Statements for the six month period ended June 30, 2025 ("1H 2025").

145. The 2024 K-1s revealed substantial and rapidly increased net losses compared with preceding years (almost double the 2023 losses and more than 5 times the 2022 losses). Waterford had reported losses of only $264,405 in 2022, increasing to a $987,650 loss in 2023, and growing

to over $1.8 million in 2024. These losses totaled over $3 million, or almost 6% of investor contributions, all of this coupled with stalled investor redemptions since July 2024.

146. The 1H 2025 Investor Statement revealed a trend toward even greater losses during the first six months of 2025, a loss of 6.06% or approximately $3.6 million- more than the combined losses for the preceding three years.

147. These reported losses demonstrated that unrealized gains reported from 2017-2021 lacked substance. Now that Waterford has ceased purchasing and marking up insurance policies, it has no ability to generate artificial unrealized "gains" to offset its operating expenses and realized losses.

148. In announcing in late 2021 that the Fund would wind down, the Griffin Defendants had stated as follows: "Additionally, Waterford has accumulated a seasoned portfolio of policies that has excellent profit potential and will benefit from realized gains as these policies mature. So, while we cannot forecast the future, we do expect the Funds will continue to generate strong risk-adjusted returns." The 2024 K-1s and 1H 2025 Investor Statements (and accompanying communications) show that the foregoing statement was false, and in fact the true economic value of Fund investors' membership interests was significantly lower than indicated by the NAVs previously reported in quarterly statements and audited financials prior to December 2021.

149. The accompanying communication to the 1H 2025 loss announcement further shows the Griffin Defendants' abdication of accountability towards investors. The entirety of the letter is contained in a single, curt, paragraph: "Dear Investor, HASelect - Waterford LLC (the "Fund") returned -6.06% for midyear 2025. Going forward, as per the Fund's operating documents and at management's discretion, the Fund will only be providing semiannual investment

statements as soon as they are available for distribution following year-end and the midyear marks. Thank you. Sincerely, HedgeACT Client Services, HASelect-Waterford LLC."

150.    Only following receipt of the 2024 K-1s and 1H 2025 Investor Statements in August 2025 did Waterford investors reasonably understand that: (a) the timeline to full recovery of invested capital had lengthened dramatically from the originally promised December 2025 wind-down to an implied multi-decade recovery period based on the current (and deteriorating) 1.8% annual distribution rate; and (b) the economic value of their units—measured by projected discounted cash flows— was in free fall, with losses now reversing pre- wind-down (inflated) gains.

151.    Prior to receiving the 2024 K-1s and 1H 2025 Investor Statements, investors did not have access to any solid information establishing that Waterford's previously reported gains were to dramatically reverse after wind-down.

### L.  December 2021 Redemption Suspension

152. On September 24, 2021 Fund management communicated that, due to a large number of requests, investor redemptions from Waterford were on hold pending review by December.  September 2024 is when Waterford's redemption gating effectively began.

153.    On December 28, 2021, the Griffin Defendants suspended all redemptions and announced initiation of a wind-down. The reason provided in the Fund's newsletter was purportedly that Waterford had received too many redemption requests to honor them.

154.    Amazingly, after restricting Waterford redemptions in September 2021, Griffin continued marketing Waterford (*e.g.,* in a webinar held in November, 2021) without disclosing the Fund's gating restrictions to new investors. Furthermore, in said webinar, it was disclosed that Waterford had recently gone on a policy shopping spree, buying $8 million worth of new life

31

insurance policies, even in the face of mounting investor redemption requests and redemption restrictions.

155.    Waterford suspended redemptions after the Griffin Defendants had extracted artificially high Management, Subadvisory, and Platform fees of $6.6 million, based on artificially inflated NAV over an extended period from 2017-2021.

156.    The suspension of redemptions suggests Defendants' awareness that the Fund could not continue honoring redemptions at its inflated NAV and that its true NAV was far lower than represented, so that any redemptions at the stated NAV would be dilutive to remaining unitholders.

**M.  The Failed Wind-Down**

157. At the time of gating, in their December 28th, 2021 Newsletter, the Griffin Defendants represented that Waterford's wind-down would be essentially completed by December 2025: "We have taken this decision because we believe this will provide the best opportunity to maximize the Funds returns. We project final distributions will be made in approximately 48 months, though timing will be completely dependent upon Waterford being able to prudently sell policies at prices the Investment Manager deems appropriate."

158.    By Q2 2023, having seen no redemptions and losing confidence in management and on the publicized wind-down schedule, a supermajority of investors constituting over 90% of Waterford's ownership demanded on April 7, 2023 GCM's removal and transfer of management to Themis Capital Management/Andrew Williams.

159.    GCM summarily ignored this demand, continuing to charge fees and imperil the Fund.  Said refusal violates Delaware law and fiduciary duties, necessitating a receiver to protect investors.

160. The demand that investors sent to GCM provided as follows. "The undersigned hereby confirm that they wish to: 1. Receive a complete list of all life settlement policies currently held by either Waterford or Morpheus Life Fund, detailing cost basis, current fair market value, life expectancy, last underwriting and policy vitals update, last date of valuation, premium payments associated with each policy, and cash available in each fund. 2. Ensure that no cash that is either presently in, or subsequently comes into, MLF/Waterford is reinvested into any investments or securities of any kind. 3. Ensure that no policies are sold. 4. Immediately remove Griffin Asset Management, along with any other HedgeAct related or selected managers or sub-managers, from any further involvement in the Morpheus Life Fund or Waterford Funds, and transfer management responsibility for both funds or the underlying assets in-kind, to Themis Capital Management. The undersigned believe that the above are reasonable and prudent to effectuate the efficient and transparent liquidation of Morpheus Life Fund and Waterford assets."

161. As of February 2026, more than four years later, the wind-down remains substantially incomplete. Waterford has distributed only $5.679 million against $54.4 million invested capital (and a reported Fund NAV of $70,014,980 as of December 31, 2021).

162. At the current (and fast decelerating) 1.8% yearly redemption average rate, full return of capital would require approximately 55 years, however with the current rate of loss in NAV value due to fees (circa $2 million per year, in 2024), and considering the rate of zero yearly redemptions over the past 18 months, the Fund will be depleted long before then, returning zero to investors.

## N. The 2025 Operational Collapse

163. As late as March, 2025 (Newsletter for End of Year 2024), the Griffin Defendants were still conveying the pretense of a successful operation and wind-down process: "As the end

of 2026 is the targeted date for completing the wind down we believe distributions will increase substantially in 2025 and 2026." Yet by October 2025, Waterford's operations completely collapsed.

164.    In July 2025, Marcum resigned without explanation. The timing demonstrates Marcum's consciousness that its prior audit opinions were indefensible. Marcum did not even produce the 2024 Audit Report. The July 2025 announcement curtly stated to investors: "This letter is to inform you that CBIZ CPAs LLC f/k/a Marcum LLP and Marcum (Cayman) ("CBIZ") has terminated its client-auditor relationship with Griffin Capital Mgt. LLC ("GCM") and the funds that GCM manages as well as resigning as the funds' tax preparer. CBIZ's termination and resignation was abrupt and it provided no explanation for its decisions."

165.    The portfolio manager (Christopher Erwin and his firm Global Capital Consulting, "GCC", Subadvisor to the Fund) resigned in late 2024 (November 19, 2024 Form ADV, CRD Number: 309981) with no announcement by the Fund's management and no replacement appointed, leaving no one responsible for managing the portfolio, monitoring premiums, tracking maturations, or executing sales.

166.    In March 2025, Griffin Asset Management LLC filed its annual Form ADV with the SEC (Form ADV, CRD Number: 268821). GAM excluded Waterford from its list of managed funds, while listing Waterford International Fund (the offshore feeder), although Waterford remains under the management of GAM.

167.    In October 2025, the IRA custodian, Forge Trust Co., designated Waterford as "Distressed," reflecting operational dysfunction, substantial impairment of investor interests, and unlikelihood of capital recovery. The designation came shortly after the Fund failed to even transmit NAV reports for over one year to the IRA custodian.

34

168.    Shortly thereafter, the Fund's Administrator (NAV Consulting Inc.) was fired or resigned (actual reasons were not disclosed to investors) and replaced with Formidium Corp., which now produces unaudited statements.

169.    GCM has also drastically reduced the frequency and detail of its reports to investors concerning Waterford's operations and financial results.  In what amounts to a two-sentence investor report for the August 2025 update for 1H 2025, Griffin simply reported an operating loss of 6.06% for 1H 2025 and announced a switch to semiannual reporting: "Going forward, as per the Fund's operating documents and at management's discretion, the Fund will only be providing semiannual investment statements as soon as they are available for distribution following yearend and the midyear marks." A footnote directs the investor to "see the Fund's annual audited financial statements" for more information, but Waterford has yet to produce audited financials for either 2024 or 2025.

170.    Defendants may justify these delays in reporting based on a conveniently timed change in GAM's regulatory status.  In the August 2024 Newsletter, Griffin announced that "the Fund's Investment Manager, Griffin Asset Management, LLC, has reverted to its former status as an Exempt Reporting Adviser which, amongst other things, means it no longer needs to comply with the requirements set forth in 17 CFR § 275.206(4)-2, commonly known as the Custody Rule, which, amongst other matters, govern the timing of distribution of a Fund's audited financial statements. As a result, the auditor's focus was on clients that were still subject to the deadline. This, amongst other matters outside of management control, is the cause of the delay in the distribution of the Fund's audit this year. We apologize for the inconvenience and anticipate that the audit will be released in the near future." This deliberate move to Exempt Reporting, at a time when the Fund was showing the signs of distress, and along with Marcum's resignation, has

35

delayed Waterford's financial reporting and prevented investors from knowing the Fund's true and complete financial condition.

171. As of February 2026, Waterford operates without any auditor oversight, portfolio management, realistic prospect of completing wind-down within a reasonable time, or functioning governance.

## O. Cook County Action and Tolling

172. Plaintiff filed an action in Cook County Circuit Court, Illinois (*Cori-Schubert de Cori Trustee of Cori-Schubert de Cori Revocable Trust v. HASelect-Waterford, LLC, et al.,* No. 2025CH04936, hereinafter referred to as the "Cook County Action") asserting substantially similar claims against GCM, GAM, Griffin, Waterford, and Marcum based on the same core factual allegations asserted herein.

173. Marcum was named as a party in the Cook County Action, pursuant to 735 ILCS 5/2-402, a statute that permits the plaintiff in a civil action to name persons as respondents in discovery and seek documents and information from such persons before actually asserting legal claims against them.

174. Marcum complied with Plaintiff's claims for pre-answer discovery producing documents without filing an appearance through counsel and without objecting to any of Plaintiff's requests.

175. Through this legal process and its compliance, Marcum had actual notice of claims Plaintiff intended to assert as well as the factual basis for those claims.

176. The Cook County Court subsequently dismissed the action without prejudice on forum-based grounds, holding that venue was improper or that another forum was more appropriate.

177.    The dismissal (January 20, 2026) was not based on merits, statute of limitations, or failure to state a claim. It was purely procedural based on forum determination.

178.    Plaintiff filed this action promptly following the Cook County dismissal.

## P.  Why Discovery Could Not Have Occurred Before 2024–2025

179.    Plaintiff could not have discovered the fraudulent discount rate manipulation and false validation representations before 2024–2025 despite reasonable diligence because the fraud was inherently self-concealing and actively concealed by Defendants.

180.    Before May 2025, Plaintiff and other investors knew only the following: (a) September 2021: Waterford suspended redemptions due to volume of redemption requests; (b) December 2021: Waterford announced wind-down to be completed in approximately 48 months (by December 2025); (c) 2022–2024: Distributions were slow but occurring (totaling $5.679 million); and (d) quarterly reports continued showing reported NAVs reflecting investment gains in the Fund's policy portfolio.  These facts suggested the Fund faced liquidity challenges and slow wind-down, but did not reveal the systematic overvaluation of Waterford's policy portfolio by the Griffin Defendants.

181.    The September 2021 redemption suspension and December 2021 wind-down announcement could be explained by legitimate causes that do not involve fraud: Life settlement funds are inherently illiquid (policies cannot be quickly sold at full value), high redemption volume legitimately creates liquidity pressure, and funds like Waterford typically wind-down after a period of years.

182.    Only after May 2025, when Plaintiff obtained information concerning (a) the L&E disclaimers, (b) the policy specific discount manipulation, and (c) Waterford's spiraling, significantly higher operating losses in 2024 and 1H 2025, did the fraud become discoverable.

183. Defendants also actively concealed their tortious conduct via their ongoing false and misleading reported financial statements, statements to the effect that L&E independently validated the Fund's management's valuation methodologies, and false promises (reiterated as late as March 2025) of an orderly wind-down beginning in December 2021 that would purportedly lead to the return of investors' capital, with gains.

## Q. Plaintiff-Specific Allegations

184. Plaintiff made investments in Waterford during 2017-2021.

185. Plaintiff made these investments in reliance on: (a) quarterly reports representing NAV was accurately calculated; (b) audited financial statements representing fair presentation in accordance with GAAP; (c) offering documents representing independent validation by L&E; and (d) representations of positive performance.

186. Had Plaintiff known the truth-- that the Fund's NAV was inflated, that L&E did not independently validate the methodology used to value the Fund's life insurance policy portfolio, and that Waterford's reported gains were fictitious-- Plaintiff would not have made additional investments and would have redeemed existing investments long before gating.

187. Plaintiff and other members of the Class were concretely harmed by overpaying for Waterford units due to the Fund's inflated NAV.

188. Plaintiff paid at the inflated NAV per unit reported in quarterly reports (normalized to $1.00 per unit) when true NAV—calculated using market-appropriate discount rates of 15 to >18 percent—was approximately $0.75 per unit.

189. Plaintiffs and other Class members were also harmed by: (a) false representations concerning the Fund's operating results and value that induced Plaintiff to hold rather than redeem before the Q3/Q4 2021 gating; and (b) being trapped in the Fund after it was gated.

38

190.    Plaintiffs and other Class members also suffered actual economic loss due to the estimated $11.5 million in Management, Incentive Allocation, and Platform fees extracted from Waterford in 2017-2024 (and additional as-yet unreported fees extracted in 2025 and 2026) based on fraudulently inflated NAV calculations, reducing the pool of assets available for distribution to investors.

## V.    CLASS ALLEGATIONS

191.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) on behalf of: All persons who invested in or held membership interests in HASelect-Waterford LLC from January 1, 2017 to the present ("Class").

192.    Excluded from the Class are: Defendants, their immediate families, entities they control, their legal representatives, and judicial officers presiding.

193.    Numerosity: The Class is so numerous that joinder is impracticable. Waterford had approximately 150-200 investors. Identities of Class members are readily ascertainable from Waterford's records.

194.    Commonality: Common questions include: whether Defendants made false statements regarding NAV; whether Defendants manipulated discount rates; whether conduct violated securities laws; whether GCM and GAM breached fiduciary duties; whether Marcum committed malpractice; whether Defendants' conduct caused damages; the appropriate measure of damages; and whether appointment of receiver is warranted.

195.    Typicality: Plaintiff's claims are typical of Class members. Plaintiff invested during the Class Period, relied on the same false statements, suffered damages in the same manner, and seeks the same relief as other Class members.

39

196.     Adequacy: Plaintiff will fairly and adequately represent the Class. Plaintiff has no antagonistic interests. Plaintiff has retained competent counsel experienced in complex class action litigation.

197.     Rule 23(b)(1): This class action is maintainable under Rule 23(b)(1) because prosecuting separate actions would create risk of inconsistent adjudications or adjudications dispositive of other members' interests.

198.     Rule 23(b)(2): This class action is maintainable under Rule 23(b)(2) because Defendants acted on grounds generally applicable to the Classes, making appropriate final injunctive and declaratory relief.

199.     Rule 23(b)(3): This class action is maintainable under Rule 23(b)(3) because common questions predominate and class action is superior to other methods.

200.     Predominance: Common questions predominate.  All Class members received the same quarterly reports, audited financial statements, audit opinions and other documents containing the same false representations. Defendants applied the same fraudulent valuation methodology across Waterford's entire portfolio, harming Class members in a uniform manner.

201.     Superiority: Litigation of this action as a class action is superior because the individual claims of Class members do not justify expense of individual litigation, and litigation of Class members claims as class action avoids duplicative discovery and inconsistent outcomes. This case is highly manageable with predominating common issues, and no superior alternative to adjudication via a class action exists.

## VI.    CLAIMS

### COUNT I

**BREACH OF FIDUCIARY DUTY**
**(Against GCM and GAM)**

202.    Plaintiff incorporates by reference paragraphs 1 through the immediately preceding paragraph.

203.    This claim is brought under Delaware law governing Waterford's internal affairs.

204.    GCM, as sole managing member, and GAM, as investment manager controlling valuations, owed fiduciary duties of loyalty and care to Waterford's members.

205.    GCM and GAM breached fiduciary duties by: (a) systematically manipulating discount rates over four-and-a-half years to materially inflate reported NAV despite actual knowledge market discount rates were in the range of 15-18 percent or more; (b)  extracting approximately $4-6 million in excessive Management, Subadvisory, and Platform fees between 2017 and 2025, based on fraudulent valuations; (c) failing to disclose material conflicts including absence of independent validation, exclusive unchecked control over valuations, and deviation from market rates; and (d) consciously disregarding investors' interests by allowing Griffin to redeem at an inflated NAV after gating; (e) abandoning the responsibilities to sell the assets in a timely manner during wind-down, all while continuing to extract fees.

206.    Because GCM's and GAM's compensation was directly calculated as a percentage of the NAV they themselves determined using discount rates they selected, and because Griffin personally redeemed his investment (later "reclassified" as a "Crystalized Incentive Allocation withdrawal") at this self-determined inflated NAV before gating, these transactions constitute self-dealing under Delaware law and are subject to the entire fairness standard of review.

207.    Under Delaware's entire fairness standard, GCM and GAM bear the burden of proving both fair dealing and fair price with respect to these transactions, because they stand on both sides of the transactions.

208.    Defendants' conduct also constitutes bad faith under Delaware law through: (a) intentional dereliction of duty (systematic application of rates known to deviate materially from market without documented basis); (b) conscious disregard for responsibilities (receiving explicit warnings yet continuing fraud); and (c) actual intent to obtain improper personal benefit (Griffin's redemptions at artificially high price and GCM and GAM's inflated fees).

209.    GCM and GAM's conduct constitutes bad faith under Delaware law through the following specific acts and omissions demonstrating intentional dereliction of duty and conscious disregard for members' interests:

210.    First, GCM and GAM had actual knowledge from Waterford's own acquisition transactions that market discount rates were primarily 15 to >18%. Despite this direct market evidence, GCM and GAM consciously chose to value the portfolio at 10–12% rates for investor reporting—a 5 to >8 percentage point deviation they knew was unjustified. This was not a business judgment call within a reasonable range; it was a conscious decision to use rates they knew did not reflect market realities and discount rates implied by arms'-length market transaction prices.

211.    Second, GCM and GAM applied the below-market discount rates systematically to the vast majority of the portfolio across all 18 consecutive quarterly reports from 2017 through 2021, negating the inference that their conduct was an isolated error, oversight, or good-faith but mistaken business judgment.

212.    Third, on April 7, 2023, and reiterated in the Cook County Litigation, investors holding a supermajority of Waterford's ownership demanded GCM's removal and transfer of

42

management to Themis Capital Management.  GCM summarily ignored this demand and continued charging fees.

213.    Fourth, since the December 2021 wind-down announcement, GCM and GAM have continued extracting management fees despite: distributing only $5.679 million against $54.4 million invested (10.4% over 4-plus years).

214.    Fifth GAM and GCM have operated the Fund without an auditor since July 2025; and have been operating without a portfolio manager since 2025.

215.    To the extent the Operating Agreement (Master LLC Agreement § 2.4(a); Waterford Series Supplement § 6.01(a)) contains exculpatory provisions purporting to eliminate or limit fiduciary liability, such provisions cannot shield the conduct alleged herein because: (a) Delaware law prohibits elimination of liability for bad faith, disloyal, or knowingly unlawful conduct; and (b) the systematic overvaluation to generate excessive fees constitutes quintessential bad faith and disloyalty, not mere negligence in business judgment.

216.    Exculpatory provisions do not protect this conduct because Delaware law prohibits elimination of liability for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law. *See* 6 Del. C. § 18-1101(e). The systematic discount rate manipulation alleged herein constitutes bad faith and intentional misconduct falling outside any contractual safe harbor.

217.    As direct and proximate result of Defendants breaches of fiduciary duty, Plaintiff and Class have suffered damages including overpayment for membership interests in the Fund, lost redemption opportunities, excessive fees and expenses, and lost time value of money due to their funds being trapped in Waterford during its.

## COUNT II

### APPOINTMENT OF RECEIVER / LIQUIDATING TRUSTEE
**(Against All Defendants)**

218. Plaintiff incorporates by reference paragraphs 1 through the immediately preceding paragraph.

219. This Count seeks appointment of independent receiver or liquidating trustee to complete wind-down and preserve remaining assets.

220. Waterford faces immediate ongoing threats to its assets and other severe operational issues requiring immediate intervention, including: (a) policies at imminent risk of lapse if premiums are not paid; (b) possibility of uncollected death benefits on maturing policies; (c) ongoing asset depletion through management fees; (d) lack of portfolio management following resignation of Erwin/GCC; (e) lack of audit oversight following Marcum resignation; and (f) failure to conduct wind-down with reasonable alacrity (in over four years, Waterford has distributed only $5.679 million against $54.4 million invested capital (and reported Fund NAV of $70,014,980 as of December 31, 2021)).

221. Based on the foregoing, the Griffin Defendants have proven unable and unwilling to liquidate the Fund in an orderly manner and are motivated by ongoing receipt of fees and expenses to continue the Fund indefinitely.

222. The ongoing threats to the Fund's assets and severe operational issues demonstrate that receivership is necessary to protect remaining value. Unlike Plaintiff's damages claims which address historical misconduct, the receiver appointment addresses present and imminent threats including: (a) possibility of policy lapses occurring due to inadequate premium management; (b) possibility of death benefits maturing now but not being collected; (c) fees being extracted now

44

without corresponding services; and (d) absence now of any auditor, portfolio manager, or functioning governance capable of protecting investor interests.

223.   These are not historical wrongs but present ongoing threats requiring immediate intervention to prevent further dissipation.

224.   Waterford faces immediate, imminent threats of asset dissipation requiring appointment of a receiver:

225.   First, GCM and GAM continue extracting management fees despite providing no meaningful management services. Since the portfolio manager's resignation and Marcum's resignation, GCM and GAM have extracted fees while providing no portfolio management and with no portfolio manager in place after the resignation of Erwin.

226.   Second, Defendants have produced no audited financial statements, for 2024 or 2025, with Marcum resigning before opining on the Fund's 2024 financials.  This lack of audited financials calls leads to a potential for misuse of the Fund's assets.

227.   Third, as of the date of this filing, Waterford operates with no effective oversight: The Fund has no Auditor.  Marcum resigned in July 2025, and no replacement has been appointed. The Fund also has no Portfolio Manager- Waterford's Portfolio Manager resigned in 2024 and no replacement has been appointed. Finally, the Fund has no independent directors, no audit committee, and no member oversight rights to protect investors' interests or conserve the Fund's assets.

228.    Reflecting Waterford's disarray and lack of oversight, IRA custodian Forge Trust Co. designated Waterford as "Distressed" in October 2025 (reflecting institutional determination that the Fund is impaired).  The Fund's former administrator, NAV Consulting Inc., has also been

45

replaced with Formidium Corp., which has disseminated unaudited financial statements of unknown reliability.

229. This complete breakdown of governance creates imminent risk that Waterford's assets are being mismanaged or wasted, opportunities to sell policies or collect benefits are being missed, reporting to investors is unreliable, and no person with fiduciary duty is actively protecting investor interests.

230. Legal remedies (money damages) are inadequate for the following specific reasons:

231. First, money damages are retrospective; ongoing harm requires prospective relief. A money judgment compensates for past harm but does nothing to prevent ongoing harm from continued policy lapses, continued failure to collect death benefits, continued fee extraction, and continued asset depletion. Only prospective equitable relief (*i.e.,* a receiver taking control now) can stop these ongoing losses.

232. Second, the Fund's assets are unique and not replaceable by money damages. The life insurance policies are unique assets with value that will be lost if policies lapse or premiums are not paid. Money damages cannot restore a lapsed policy. Only immediate intervention preventing lapse can preserve asset value.

233. Third, a complex multi-year wind-down of Waterford requires expert oversight. Completing wind-down requires specialized knowledge of life settlement markets, active portfolio management, negotiation with policy buyers, premium optimization decisions, and death benefit claims processing. Defendants have demonstrated inability to perform these functions. Money damages cannot substitute for competent ongoing management.

234. No internal governance mechanism remains capable of addressing these threats: Marcum resigned in July 2025; the portfolio manager departed in 2024 with no replacement;

46

GCM/GAM continue to charge fees but provide no effective management; and investors lack access to information or ability to intervene.

235.   Even if Defendants contest historical fraud allegations, current mismanagement independently warrants appointment of a receiver.  The Fund operates as a rudderless ship without an auditor, without a portfolio manager, and under a "Distressed" designation.  The Fund shows no signs of progress toward an orderly wind-down within a reasonable period, despite the Griffin Defendants' promises that Waterford would be wound down.

236.   Plaintiff requests the Court appoint an independent receiver with authority to: (a) assume control of assets and operations; (b) monitor premiums and prevent lapses; (c) collect death benefits; (d) execute policy sales; (d) review and reduce expenses; (f) retain qualified service providers; (g) provide regular reporting; (h) complete wind-down efficiently; (i) make distributions; (j) wind up affairs and dissolve when appropriate; and (k) exercise other powers the Court deems necessary.

## <u>COUNT III</u>

### VIOLATIONS OF ILLINOIS SECURITIES LAW OF 1953
### (Against GCM, GAM, and Griffin)

237.   Plaintiff incorporates by reference paragraphs 1 through the immediately preceding paragraph.

238.   This claim is brought under Sections 12(F) and 12(G) of the Illinois Securities Law of 1953.

239.   Illinois statutory law applies because fraudulent offers and communications originated from Illinois: all offering documents were prepared and distributed from GCM's Illinois offices, all investor communications originated from Illinois, all subscriptions were processed in Illinois, and key personnel operated from Illinois. This Illinois-based offering establishes nexus

for application of Illinois law to all investors whose transactions were effected through Illinois, regardless of residence.

240. GCM, GAM, and Griffin, in connection with offer and sale of Waterford interests: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements including that NAV was fairly calculated, valuations were independently validated, and Fund generated positive returns; (c) omitted material facts including deviation from market rates, absence of validation, exclusive management control, and conflicts of interest; and (d) engaged in fraudulent practices including systematic discount rate manipulation.

241. The Griffin Defendants acted with scienter through: (a) actual knowledge from L&E disclaimers proving representations were false; (b) actual knowledge from market evidence through every acquisition that rates were in the range of 15 to 18 percent or more; (c) fee-based motive generating approximately $4-6 million in excessive fees; (d) Griffin personal trading pattern; and (e) systematic five-year pattern across the vast majority of the portfolio.

242. The Griffin Defendants' false statements are objectively verifiable as false because they violated GAAP ASC 820 requiring fair value measurements reflect market participant assumptions and use observable inputs. Defendants' 10-12 percent rates did not reflect market participant assumptions (evidenced by acquisition prices) and ignored observable inputs.

243. Plaintiff and members of the Class relied on false statements in quarterly reports, audited statements, and offering documents. Had Plaintiff known truth, Plaintiff would not have invested and would have redeemed long before gating.

244. Plaintiff and member of the Class were harmed by the Griffin Defendants' violations via overpayment for Fund units, lost opportunity to redeem, and the Griffin Defendants' ongoing charging of excessive fees.

245.   Plaintiff could not have discovered their claims at an earlier date.  Discovery occurred in 2025 when Plaintiff obtained L&E documents, Marcum-Griffin production files, and the Fund's 2024 K-1s and 1H 2025 Investor Statements showing significantly increased losses. Earlier discovery was impossible due to active concealment.

246.   Plaintiff and Class are entitled to: (a) rescission (return of all consideration paid less amounts distributed plus interest); (b) actual damages if rescission not elected; and (c) costs and attorneys' fees.

## <u>COUNT IV</u>

### PROFESSIONAL MALPRACTICE / ACCOUNTING MALPRACTICE
### (Against Marcum)

247.   Plaintiff incorporates by reference paragraphs 1 through the immediately preceding paragraph.

248.   This claim is brought under New York law governing malpractice by New York-based auditors.

249.   New York requires privity or near-privity under *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N..3d 536 (1985).  All three *Credit Alliance* factors are satisfied: (a) Marcum was aware audit reports would be used by investors to make investment decisions, as shown by engagement letter, Operating Agreement audit requirement (Master LLC Agreement § 2.6(b)). Marcum received actual investor lists from Waterford and saw investor names on K-1 distributions it helped coordinate, giving it direct knowledge of the specific, finite, identifiable investor group. SEC Custody Rule compliance purpose; (b) Plaintiff and Class were known parties (specific identified group of approximately 150-200 investors whose identities were known through investor lists and K-1 distributions, not an unlimited indeterminate class of persons); and (c) conduct linking Marcum to Plaintiff exists as follows:

250.    First, Marcum coordinated K-1 timing with Waterford's investor distributions, knew its audit opinions were incorporated in materials sent to investors in the Fund, and addressed its opinions to Waterford unitholders.  Marcum's audit reports were directly addressed to investors. Marcum's audit opinions for fiscal years 2017 through 2023 were expressly addressed "To the Members of HASelect-Waterford LLC" (and in the 2022 audit, incorrectly as "to the Shareholders"). By addressing its professional opinions directly to the investor group, Marcum manifested its understanding that investors would rely on its opinions.

251.    Second, Marcum annually received current investor lists showing the names, addresses, capital account balances, and investment amounts for each of Waterford's approximately 150–200 investors. Marcum thus knew the precise, finite, and limited group of investors who would receive and rely on its audit opinions—this was not an unlimited or indeterminate class.

252.    Third, Marcum sent audit questionnaires to L&E specifically inquiring about L&E's role in valuations that would be relied upon by investors. This demonstrates Marcum's understanding that its audit work related to valuations investors would rely upon.

253.    Fourth, Waterford's Operating Agreement required annual audits specifically to satisfy SEC Investment Advisers Act custody rule requirements (Rule 206(4)-2), which are designed to protect investors by ensuring independent verification of client assets. Marcum's engagement was thus specifically undertaken to provide investor protection under federal securities regulations.

254.    Fifth, Marcum's audit opinions were included in annual report packages sent directly to all investors.  Each year, Waterford distributed annual report packages to all investors containing audited financial statements, Marcum's audit opinion, and management discussion.

Marcum knew its opinions were transmitted directly to the specific investor group as part of regular investor communications.

255.    Sixth, over a period of seven years Marcum repeatedly addressed opinions to members, coordinated K-1s, received updated investor lists, and knew its work product would be distributed to the same finite investor group.  This multi-year pattern of conduct directed toward the specific investor class establishes the unmistakable relationship required for privity.

256.    Alternatively, if the Court determines full privity does not exist, New York law permits malpractice claims where auditor's conduct constitutes gross negligence. Marcum's conduct constitutes gross negligence (failure to exercise even slight care, reckless disregard) through: ignoring explicit L&E red flags, performing zero testing on the most material audit areas, and issuing clean opinions despite documentary warnings.

257.    As PCAOB-registered auditor, Marcum owed duty to perform audits in accordance with PCAOB standards and with reasonable care.

258.    Marcum violated standards by: (a) failing to obtain sufficient appropriate evidence regarding discount rate reasonableness despite this being most material area (AS 1105); (b) failing to maintain professional skepticism despite multiple red flags (AS 1015); (c) failing to properly evaluate management's estimates (AS 2501); (d) failing to respond to fraud risks (AS 2301); and (e) failing to evaluate internal controls (AS 2110).

259.    Marcum's audit amounted to "no audit at all" where Marcum performed no substantive testing of most material area despite obvious fraud risks and explicit contradictory evidence.

260.    Marcum's malpractice directly caused damages through but-for causation: but for Marcum's failures, fraud would have been detected and stopped in 2017-2018 or after receiving

L&E's annual disclaimers, and Plaintiff would not have made additional investments and would have redeemed long before gating.

261.    Had Marcum fulfilled its professional duties upon receiving the L&E disclaimers throughout the audit period, Marcum would have been required to either: (a) refuse to issue an unqualified audit opinion; (b) disclose to investors of the absence of independent validation and the deviation of discount rates from market evidence; (iii) require adjustment of the Fund's reported NAV to reflect market-appropriate discount rates; or (iv) withdraw from the engagement.

262.    Any of these actions in 2018-2019 would have alerted investors to the systematic overvaluation and prevented Plaintiff's subsequent investments.

263.    But for Marcum's continued issuance of unqualified audit opinions in 2018, 2019, 2020, 2021, 2022, and 2023 despite possession of the L&E disclaimers and other red flags, the fraud would have been exposed, Plaintiff would have been able to exit the investment, and the losses alleged herein (or some of them) would not have occurred.

264.    Plaintiffs and member of the Class were harmed by Marcum's malpractice via overpayment for Fund units, lost opportunity to redeem, and the Griffin Defendants' ongoing charging of excessive fees.

## COUNT V

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Marcum)

265.    Plaintiff incorporates by reference paragraphs 1 through the immediately preceding paragraph.

266.    GCM and GAM breached fiduciary duties as alleged in Count I.

267.    Marcum had actual knowledge (not constructive) of breaches through: (a) L&E disclaimers showing that L&E utilized defined portfolio assumptions (including discount rates)

consistent with the approaches selected by the Fund's management in reaching its valuation determinations; (b) actual knowledge from audit access to acquisition prices showing market rates were 15 to >18 percent while management applied 10-12 percent; and (c) actual knowledge of systematic pattern of drastic markups in the purported value of policies in Waterford's portfolio, over and above the prices at which the policies had been acquired in the market, in the absence of any documented basis for the discount rates used.

268.    Marcum also had actual knowledge that the discount rates used for NAV calculations (10-12%) were materially inconsistent with the rates implied by Waterford's own acquisition pricing because Marcum had access to and reviewed these acquisition transactions in Waterford's books and records and in audit work papers.

269.    Marcum understood that these facts—false representations of validation combined with systematic use of below-market discount rates directly enriching conflicted fiduciaries—constituted breaches of fiduciary duty because they involved intentional overvaluation that generated millions in excessive fees at investors' expense.

270.    Marcum provided substantial assistance through: (a) unqualified audit opinions that enabled continued breaches of duty by GAM and GSM and prevented investor discovery; and (b) affirmative misrepresentations in audit opinions regarding GAAP compliance, PCAOB compliance, and fair presentation despite actual knowledge of violations.

271.    Marcum had actual knowledge that its audit opinions were false and that it was assisting fraud through the following facts:

272.    First, Marcum was contemporaneously aware that the Fund's discount rates employed and policy valuation methods were not independently validated by L&E. L&E disclosed

53

to Marcum that it utilized defined portfolio assumptions (including discount rates) consistent with the approaches selected by the Fund's management in reaching its valuation determinations.

273.    Second, Marcum's own calculations contradicted its audit opinion. Marcum's valuation workpapers for 2019, 2020, 2021, and 2022 show that Marcum independently calculated higher net present values than L&E reported (MARCUM-GRIFFIN _00087735; _00004211; _00018731; _00035268). Despite AU-C 620.19 requiring investigation of such discrepancies, Marcum documented no investigation and simply concluded L&E's lower valuation was "reasonable" without analysis. These  facts demonstrate that Marcum knew its own analysis contradicted the reported valuations, yet issued clean opinions anyway.

274.    Third, Marcum audited Waterford's policy acquisition transactions and had access to purchase prices and transaction data. These acquisition prices implied discount rates of 15 to >18%, as Defendants paid prices reflecting higher discount rates (lower present values) when purchasing policies. Marcum thus had direct observable market evidence that management's 10–12% rates deviated materially from market. Marcum's awareness of both the acquisition prices and the reported valuations establish actual knowledge that reported valuations were inflated.

275.    Fourth, publicly available information indicates that Marcum's audit practice during the relevant period was rife with substandard practices.  During 2017–2022, the SEC imposed a $10 million penalty on Marcum for systemic quality control failures affecting 85% of audits examined. The SEC found Marcum partners repeatedly failed to obtain sufficient audit evidence, ignored contradictory evidence, and failed to investigate fraud risks. Marcum thus had institutional knowledge during the Waterford audit period that its audit procedures were systemically deficient and that it was failing to detect fraud.

276.    Fifth, Marcum served as auditor for at least six separate Griffin fund entities. The pattern of: (a) unrealized gains vastly exceeding realized gains; (b) performance fees charged on phantom gains; (c) subsequent reversal of gains; and (d) Marcum's simultaneous resignation from all Griffin funds in July 2025 demonstrates Marcum's awareness that the valuation issues were systemic across the fund complex, not isolated errors.

277.    Sixth, Marcum resigned abruptly in July 2025 from all Griffin fund engagements simultaneously, without explanation, and without producing the 2024 audit report. The timing— immediately before the August 2025 disclosure of trends showing massive losses and K-1 reversals—suggests Marcum knew that its prior audit opinions were indefensible and that continued association would expose Marcum to further liability.

278.    Marcum's substantial assistance directly caused damages: Plaintiff made investments in the Fund after receiving L&E's annual disclaimers were made in reliance on Marcum's false 2018-2020 opinions. Plaintiff and other members of the Class also would have had the opportunity to exercise remedies including redemption and legal action, had they been aware of the falsity of Marcum's audit opinions and the underlying reported financial results and NAVs reported by Marcum.

## VI.    JURY DEMAND

279.    Plaintiff demands a trial by jury on all claims so triable.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the proposed Class, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

A.      Determine that this action may be maintained and certified as a class action on a nationwide basis under Rule 23(b)(1), 23(b)(2) and/or 23(b)(3) and designate and appoint Plaintiff as Class Representative, and Plaintiff's counsel as Class Counsel under Rule 23(g);

B.      Declare (i) that that Michael Griffin violated Illinois Securities Law Sections 12(F) and 12(G); (ii) GCM and GAM breached fiduciary duties; (iii) Marcum committed professional malpractice; (iv) Marcum aided and abetted breaches and fraud; (v) Operating Agreement exculpatory provisions do not protect this conduct; and (vi) Defendants' conduct constituted bad faith, knowing fraud, self-dealing, and unauthorized gain

C.      Appoint an independent receiver or liquidating trustee to: (i) assume immediate control of Waterford's assets and operations; (ii) monitor premium payments and prevent policy lapses; (iii) collect matured death benefits; (iv) execute policy sales to maximize recovery; (v) review and reduce expenses; (vi) retain qualified service providers; (vii) provide regular transparent reporting; (viii) complete wind-down efficiently; and (ix) make distributions.

D.      Award Plaintiff and the Class Members their actual, compensatory and/or statutory damages, according to proof;

E.      Award Plaintiff and Class Members their reasonable attorneys' fees, costs, and

pre-judgment and post-judgment interest; and

F.      Award Plaintiff and Class Members such other and further relief as this Court may

deem just and proper.

Dated:  February 23, 2026

LAW OFFICE OF
CHRISTOPHER J. GRAY, P.C.

By: Christopher J. Gray
60 East 42nd Street, 46th floor
New York, New York 10165
Ph: (212) 838-3221
chris@investorlawyers.net

LOFTUS & EISENBERG, LTD.
Alexander Loftus, Esq.
*(Pro Hac Vice Forthcoming)*
181 W. Madison, Suite 4700
Chicago, Illinois 60601
Ph: (312) 899-6625
alex@loftusandeisenberg.com

*Attorneys for Plaintiff*

57