**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CORI-SCHUBERT DE CORI, TRUSTEE OF THE CORI-SCHUBERT DE CORI REVOCABLE TRUST, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>-against-<br><br>HASELECT-WATERFORD LLC, GRIFFIN CAPITAL MANAGEMENT LLC, GRIFFIN ASSET MANAGEMENT LLC, MICHAEL GRIFFIN, and MARCUM LLP,<br><br>Defendants. | Case No. 7:26-cv-01513-PMH |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT MARCUM LLP'S MOTION TO DISMISS**

# TABLE OF CONTENTS

I. STATEMENT OF FACTS ..... 2

A. The Fund and Its Value-Driven Input ..... 2

B. The Manipulation ..... 3

C. Marcum's Knowledge and Involvement ..... 3

D. The Collapse of Waterford ..... 4

II. ARGUMENT ..... 5

A. Standard on Motion: Rule 12(b)(6) ..... 5

B. Marcum Owed a Duty to Waterford's Members Because the Relationship Between Marcum and the Investors Was the Practical Equivalent of Privity ..... 6

1. The *Credit Alliance* Standard ..... 6

2. Marcum Knew Its Audit Reports Were to be Used by Waterford's Members for Particular Purposes ..... 7

3. Waterford's Members Constitute a Known, Finite, Enumerated Class ..... 8

4. Marcum's Course of Conduct Linked It Directly to the Members ..... 10

5. At the Pleading Stage, Plaintiff's Near-Privity Allegations Must Be Credited ..... 13

C. The Complaint States a Malpractice Claim Because Marcum's Conduct Was So Reckless as to Constitute Fraud ..... 13

1. New York Permits a Non-Client to Sue an Accountant for Reckless Conduct Amounting to Fraud, and Privity Is No Bar ..... 14

2. The Complaint Pleads Specific Facts Falling Under All Three *State Street* Bases of Liability ..... 15

3. Marcum's "No Audit at All" And GAAP/GAAS Authorities Apply the Wrong Standard, but the Complaint Satisfies Them Regardless ..... 17

D. The Complaint States a Claim for Aiding and Abetting Breach of Fiduciary Duty ..... 18

1. The Complaint Pleads Marcum's Actual Knowledge ..... 18

2. The Complaint Pleads Substantial Assistance ..... 20

3. The Aiding-and-Abetting Claim Is Not Duplicative ..... 21

E. All of Plaintiff's Claims Are Timely ........ 22

1. Plaintiff's Claims Are Governed by the Six-Year CPLR 213(8) Fraud Limitations Period ........ 22

2. Even Under the Three-Year Malpractice Period, the FY2022 and FY2023 Audits Are Timely ........ 23

3. The Savings Statute and Equitable Estoppel Are Additional Grounds the Court Need Not Reach. ........ 25

F. Leave to Amend Should Be Freely Granted ........ 26

III. CONCLUSION ........ 27

# TABLE OF AUTHORITIES

**Cases**

*1650 Broadway Assoc., Inc. v. Sturm*,
228 A.D.3d 1, 210 N.Y.S.3d 19 (1st Dep't 2024) ....................21

*ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*,
25 N.Y.3d 1043 (2015) ....................19

*Ackerman v. Price Waterhouse*,
84 N.Y.2d 535 (1994) ....................23, 24

*Anwar v. Fairfield Greenwich, Ltd.*,
884 F. Supp. 2d 92 (S.D.N.Y. 2012)....................11, 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................5

*AUSA Life Ins. Co. v. Ernst & Young*,
206 F.3d 202 (2d Cir. 2000)....................9

*Bankers Conseco Life Ins. Co. v. KPMG LLP*,
189 A.D.3d 402 (1st Dep't 2020) ....................19

*Matter of Brightonian Nursing Home, Inc. v. Zucker*,
212 A.D.3d 162 (3d Dep't 2023)....................7

*Bullen v. CohnReznick, LLP*,
194 A.D.3d 637 (1st Dep't 2021) ....................18, 19

*Bullen v. Sterling Valuation Group, Inc.*,
67 Misc. 3d 1227(A) (Sup. Ct. N.Y. Cty. 2020)....................20, 21

*Caplan v. Winslett*,
218 A.D.2d 148 (1st Dep't 1996) ....................26

*Caprer v. Nussbaum*,
36 A.D.3d 176 (2d Dep't 2006)....................14, 18, 19, 20

*Chaikovska v. Ernst & Young, LLP*,
21 A.D.3d 1324 (4th Dep't 2005) ....................9

*Chase Scientific Research v. NIA Group*,
96 N.Y.2d 20 (2001) ....................22, 23

*Chill v. General Elec. Co.*,

101 F.3d 263 (2d Cir. 1996)....................17

*Citigroup Inc. v. AHW Investment Partnership*,
140 A.3d 1125 (Del. 2016) ....................24

*Credit Alliance Corp. v. Arthur Andersen & Co.*,
65 N.Y.2d 536 (1985) .................... passim

*Cromer Finance Ltd. v. Berger*,
2001 U.S. Dist. LEXIS 14744 (S.D.N.Y. Sept. 19, 2001)....................11

*CRT Invs., Ltd. v. Merkin*,
29 Misc. 3d 1218(A) (Sup. Ct. N.Y. Cty. 2010), aff'd sub nom.,
85 A.D.3d 470 (1st Dep't 2011) .................... 12, 20

*Cusimano v. Schnurr*,
137 A.D.3d 527 (1st Dep't 2016) ....................22

*DaPuzzo v. Reznick Fedder & Silverman*,
14 A.D.3d 302 (1st Dep't 2005) ....................14

*DeLollis v. Friedberg, Smith & Co., P.C.*,
933 F. Supp. 2d 354 (D. Conn. 2013)....................11

*Dorking Genetics v. United States*,
76 F.3d 1261 (2d Cir. 1996)....................12

*Duke v. Touche Ross & Co.*,
765 F. Supp. 69 (S.D.N.Y. 1991) ....................13

*Equitable Life Assurance Soc'y v. Alexander Grant & Co.*,
627 F. Supp. 1023 (S.D.N.Y. 1985)....................13

*Fidelity & Deposit Co. of Md. v. Arthur Andersen & Co.*,
131 A.D.2d 308 (1st Dep't 1987) ....................14

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
479 F. Supp. 2d 349 (S.D.N.Y. 2007)....................20

*Glanzer v. Shepard*,
233 N.Y. 236 (1922) ....................6

*Global Network Commc'ns, Inc. v. City of New York*,
458 F.3d 150 (2d Cir. 2006)....................5

*Hoffman v. RSM US LLP*,

169 A.D.3d 522 (1st Dep't 2019) ............................................................ 21, 22

*Houbigant, Inc. v. Deloitte & Touche,*
303 A.D.2d 92 (1st Dep't 2003) ............................................................ 9, 13, 17, 18

*Johnson v. Proskauer Rose LLP,*
129 A.D.3d 59 (1st Dep't 2015) ............................................................21

*Kaufman v. Cohen,*
307 A.D.2d 113 (1st Dep't 2003) ............................................................ 18, 19, 20, 22

*Klausner v. Annie's, Inc.,*
581 F. Supp. 3d 538 (S.D.N.Y. 2022)............................................................5

*LaSalle Natl. Bank v. Ernst & Young,*
285 A.D.2d 101 (1st Dep't 2001) ............................................................ 11, 12

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
797 F.3d 160 (2d Cir. 2015)............................................................17

*M&T Bank Corp. v. McGraw Hill Cos.,*
126 A.D.3d 1414 (4th Dep't 2015)............................................................8

*Malay v. City of Syracuse,*
25 N.Y.3d 323 (2015) ............................................................26

*Meridian Horizon Fund, LP v. KPMG (Cayman),*
487 F. App'x 636 (2d Cir. 2012) ............................................................ 10, 12

*Mitschele v. Schultz,*
36 A.D.3d 249 (1st Dep't 2006) ............................................................23

*Monaghan v. Ford Motor Co.,*
71 A.D.3d 848 (2d Dep't 2010)............................................................22

*New York State Workers' Compensation Bd. v. Fuller & LaFiura, CPAs, P.C.,*
146 A.D.3d 1110 (3d Dep't 2017)............................................................23

*Norex Petroleum Ltd. v. Blavatnik,*
23 N.Y.3d 665 (2014)............................................................25

*Oster v. Kirschner,*
77 A.D.3d 51 (1st Dep't 2010) ............................................................18

*Parrott v. Coopers & Lybrand,*
95 N.Y.2d 479 (2000) ............................................................ 6, 12

*Prime Plus Acquisition Corp. v. EisnerAmper LLP*,
2015 N.Y. Misc. LEXIS 4522, 2015 N.Y. Slip Op. 32336[U]
(Sup. Ct. N.Y. Cty. Dec. 10, 2015) .......... 12

*Raji v. SG Ams. Sec., LLC*,
189 A.D.3d 514 (1st Dep't 2020) .......... 26

*Ruffolo v. Oppenheimer & Co.*,
987 F.2d 129 (2d Cir. 1993) .......... 26

*Sandalwood Debt Fund A, L.P. v. KPMG LLP*,
2013 WL 3284126 (N.J. Super. Ct. App. Div. July 1, 2013) .......... 11

*Sargiss v. Magarelli*,
12 N.Y.3d 527 (2009) .......... 23

*Securities Investor Protection Corp. v. BDO Seidman, LLP*,
222 F.3d 63 (2d Cir. 2000) .......... 11

*Simcuski v. Saeli*,
44 N.Y.2d 442 (1978) .......... 26

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
33 F. Supp. 3d 401 (S.D.N.Y. 2014) .......... 17

*State Street Trust Co. v. Ernst*,
278 N.Y. 104 (1938) .......... 2, 14, 15

*Stephenson v. PricewaterhouseCoopers, LLP*,
768 F. Supp. 2d 562 (S.D.N.Y. 2011) .......... 17

*Sykes v. RFD Third Ave. 1 Assoc., LLC*,
15 N.Y.3d 370 (2010) .......... 8

*Symbol Tech., Inc. v. Deloitte & Touche, LLP*,
69 A.D.3d 191 (2d Dep't 2009) .......... 25

*Travelers Cas. & Sur. Co. v. Dormitory Auth. of N.Y.*,
2005 U.S. Dist. LEXIS 9415 (S.D.N.Y. May 19, 2005) .......... 13

*Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*,
56 A.D.3d 1 (1st Dep't 2008) .......... 21

*Ultramares Corp. v. Touche*,
255 N.Y. 170 (1931) .......... 14

*Vilsack v. Meyer*,
96 A.D.3d 827 (2d Dep't 2012) ....................23

*White v. Guarente*,
43 N.Y.2d 356 (1977) .................... passim

*Williamson v. PricewaterhouseCoopers LLP*,
9 N.Y.3d 1 (2007) .................... 24, 25

*Wimbledon Fin. Master Fund, Ltd. v. Hallac*,
192 A.D.3d 617 (1st Dep't 2021) .................... 21, 23

**Statutes**

Fed. R. Civ. P. 9(b) .................... 17, 18

Fed. R. Civ. P. 12(b)(6).................... 5, 10, 13

Fed. R. Civ. P. 12(d) ....................5

Fed. R. Civ. P. 15(a)(2)....................26

2d Cir. Local Rule 32.1.1....................11

CPLR 203(g)....................23

CPLR 205(a) .................... 25, 26

CPLR 213(8)....................2, 13, 22

CPLR 214(4)....................23

CPLR 214(6)....................23

735 ILCS 5/2-402 ....................26

**Federal Regulations**

17 C.F.R. § 275.206(4)-2 (SEC Custody Rule) ....................7

**PRELIMINARY STATEMENT**

For seven consecutive years, Marcum LLP ("Marcum") placed its independent-auditor imprimatur on financial statements built on a valuation contradicted by its own business records.

Defendant HASelect-Waterford, LLC ("Waterford") is a closed life-settlement fund whose reported value turns on the discount rate applied to a portfolio of illiquid life-insurance policies. (Compl. ¶¶ 33–34). The Griffin Defendants[1], whose fees rose and fell with that value, applied 10–12% discount rates to inflate the NAV, even though the arm's-length prices Waterford itself paid to acquire those policies implied market rates of 15% to more than 18%. (Compl. ¶¶ 40–43, 55, 76). Marcum audited those acquisitions and saw those prices. (Compl. ¶¶ 268, 274). Marcum's own workpapers produced present values that differed materially from the specialist's — a discrepancy that professional standards require auditors to investigate — yet Marcum investigated nothing, documented no reconciliation, and pronounced the figure "reasonable." (Compl. ¶¶ 101, 273). Marcum then told investors, in audit reports addressed to those investors, that the valuation had been "developed" and independently validated by a "third-party" firm — a representation the firm that did the work, Lewis & Ellis ("L&E"), had expressly disclaimed to Marcum in writing, every year. (Compl. ¶¶ 59–64, 88–89; Ballard Decl., **Exh. L**[2] at 1, 8–9). Plaintiff is one of roughly 150 to 200 Waterford Members to whom those opinions were addressed; a group Marcum could name, because Marcum received current investor lists showing each Member's name, address, capital account balance, and investment amount, every year. (Compl. ¶¶ 17, 132, 134, 251, 254).

Marcum's motion to dismiss should be denied for four reasons. **First**, Plaintiff has pleaded near-privity under *Credit Alliance*. Marcum's lead defense — that it owed investors no duty

[1] Capitalized terms not defined herein are intended to have the meanings assigned in the Complaint.
[2] References to "Exh." below are to the exhibits to the Ballard Declaration in support of the Motion, dated July 20, 2026.

because its engagement was "solely for the benefit of" Waterford — ignores that Marcum knew the audits' purpose was investor reporting, knew the finite class that would receive them, and addressed its opinions "To the Members" for seven straight years. **Second**, and independently, the well-pleaded facts show conduct so reckless as to constitute fraud under *State Street Trust Co. v. Ernst* — a theory for which lack of privity is no bar at all. **Third**, the aiding-and-abetting claim is adequately pleaded: seven years of audits, L&E's written disclaimers, and Marcum's own contrary workpapers establish actual knowledge, and affirmatively vouching for a valuation Marcum knew was unsupported is substantial assistance. **Fourth**, the claims are timely. They sound in fraud and carry the six-year period of CPLR 213(8). On the other hand, Marcum concedes that claims on reports issued on or after February 23, 2023, are timely, and its own declaration authenticates an audit report dated April 5, 2023. *See* **Exh. K.**

This case is not about an auditor that, in hindsight, second-guessed an honest estimate. It is about an auditor that held in its own files the arm's-length prices showing what these policies actually cost, yet certified valuations based on discount rates completely untethered to market reality — to individual investors it knew would rely on them. (Compl. ¶¶ 40–41, 93–94, 268, 274). As such, Marcum's motion should be denied.

## I. STATEMENT OF FACTS

### A. The Fund and Its Value-Driven Input

Defendant Waterford is a Delaware life-settlement fund (a series of HedgeACT Select, LLC) managed by Defendant Griffin Capital Management, LLC ("GCM") and advised by Defendant Griffin Asset Management, LLC ("GAM"). (Compl. ¶¶ 20–25, 35). Defendant Michael Griffin controls both GCM and GAM. *Id.* Waterford holds secondary-market life-insurance policies that are valued by discounting projected death benefits to present value. (Compl. ¶¶ 31–

34). The applied discount rate is "the most critical valuation input." *Id.* Because GCM's and GAM's fees both track net asset value ("NAV"), and GAM's fees also track reported gains, the Griffin Defendants had a direct incentive to suppress the rate and inflate NAV. (Compl. ¶¶ 22, 37, 120, 140).

### B. The Manipulation

Waterford's arm's-length purchase prices between 2017 and 2021 implied discount rates of 15% to over 18%. (Compl. ¶¶40–41). Yet immediately upon purchase, the Griffin Defendants revalued those same policies using discount rates of only 10–12% — a deviation that generated day-one markups averaging roughly 30%, and in some instances exceeding 100%. (Compl. ¶¶42–48, 55). This was not an isolated miscalculation: the Griffin Defendants applied the same suppressed rates across the portfolio for eighteen consecutive quarters, from 2017 through 2021. (Compl. ¶¶75–77, 211). The result was a steadily inflated NAV, and correspondingly, steadily inflated fees. From 2017 to 2024 alone, the Griffin Defendants extracted approximately $11.5 million in fees calculated on that inflated NAV. (Compl. ¶¶117–120, 141).

### C. Marcum's Knowledge and Involvement

Marcum served as Waterford's independent auditor from FY2017 through FY2023. Each year, Marcum issued an unqualified opinion directed to the Fund's equity holders by name — addressed "To the Members of HASelect-Waterford LLC," and in the FY2022 report "to the Shareholders" of the same LLC — with the knowledge that those opinions would be distributed to the Fund members in an annual report package. (Compl. ¶¶10, 26, 80, 126, 134, 250, 254; **Exh. K**). The Operating Agreement required that this annual audit be distributed to every LLC Member. (Master LLC Agreement § 2.6(b); Compl. ¶39). Marcum also had knowledge of every Fund member who received the opinions because it received a list of Waterford's investors every year. (Compl. ¶¶ 132, 249, 251, 255). Because Marcum received Waterford's investor lists, capital-

account balances, and K-1 data each year, and knew that each opinion was included in an annual report package distributed to Waterford's LLC Members, it knew the precise, finite group of roughly 150 to 200 investors who would receive and rely on its opinions. (Compl. ¶¶131–132, 251).

Marcum received repeated written notice that the valuation was not independently validated. L&E, the "third-party" firm Marcum's reports credited, disclosed to Marcum that it used the assumptions management selected, that its rates were "only guides," that it had "not completed a formal audit of data," and that it offered "no opinion" as to accuracy — disclaimers the complaint alleges L&E furnished every year from 2017 through 2023. (Compl. ¶¶59–65, 88–91; **Exh. L** at 8–9). And Marcum's own workpapers record present-value calculations that differed materially from the values L&E reported — a discrepancy AU-C 620.19 required Marcum to investigate — yet Marcum pronounced the valuation "reasonable" without documenting any reconciliation. (Compl. ¶¶101, 273).

### D. The Collapse of Waterford

The Fund suspended all redemptions and announced a wind-down on December 28, 2021; Marcum nonetheless issued an unqualified FY2022 audit opinion on April 5, 2023, with no going-concern qualification. (Compl. ¶¶12, 110, 153; **Exh. K** at 1–2). Marcum resigned from all Griffin funds in July 2025 and never issued a FY2024 report. (Compl. ¶¶27, 81, 164). Plaintiff first obtained the L&E disclaimers and Marcum's workpapers in 2024–2025, through discovery in a prior Cook County, Illinois proceeding in which Marcum was a named respondent. The Cook County action, filed May 2, 2025, was dismissed on forum grounds, not the merits, on January 20, 2026. Plaintiff filed here on February 23, 2026. (Compl. ¶¶45, 172–179, 182, 245).

Marcum now asks the Court to dismiss Count IV (accounting malpractice) and Count V (aiding and abetting breach of fiduciary duty) for lack of near-privity, lack of scienter, failure to plead aiding-and-abetting, and untimeliness. Marcum attaches six engagement agreements (**Exhs. A–F),** five audit reports (**Exhs. G–K**), and one L&E report (**Exh. L**) to the Ballard Decl. submitted in support of its motion.

## II. ARGUMENT

### A. Standard on Motion: Rule 12(b)(6)

On a Rule 12(b)(6) motion, courts accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Klausner v. Annie's, Inc.,* 581 F.Supp.3d 538, 546 (S.D.N.Y. 2022) (Halpern, J.). The complaint need only "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. The Rule "assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it." *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir. 2006). Marcum bears the burden of showing the complaint fails to state a claim, and, on its limitations defense, of establishing that the claims are untimely.

Two corollaries govern here. First, the Court's review is confined to the complaint, documents incorporated by reference or integral to it, and matters subject to judicial notice; if the Court considers other extrinsic material, it must convert the motion to one for summary judgment under Rule 12(d). *Id.* at 154–55. Second, even as to documents properly before it, the Court does not resolve disputed issues of fact on a motion to dismiss; where an exhibit merely joins issue with a well-pleaded allegation rather than conclusively refuting it, the allegation is credited, and the inference runs to the plaintiff. *Id.* at 155.

### B. Marcum Owed a Duty to Waterford's Members Because the Relationship Between Marcum and the Investors Was the Practical Equivalent of Privity

The Complaint establishes the "relationship so close as to approach that of privity" required by New York law for a non-client negligence claim against an accountant. *See Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 546 (1985); *Parrott v. Coopers & Lybrand,* 95 N.Y.2d 479, 483 (2000). As argued below, if the Court views Marcum's conduct as reckless misrepresentation, privity is no bar; if it views the conduct as professional negligence, the near-privity relationship analyzed here supplies the duty. Plaintiff need prevail on only one path.

1. <u>The *Credit Alliance* Standard</u>

New York law has long recognized that an accountant owes a duty to identifiable third parties who foreseeably rely on its work. *See Glanzer v. Shepard*, 233 N.Y. 236 (1922); *White v. Guarente*, 43 N.Y.2d 356 (1977); *European American Bank & Trust Co. v. Strauhs & Kaye*, decided with *Credit Alliance,* 65 N.Y.2d at 543. A non-client need not show contractual privity, but a relationship that was "the practical equivalent of privity." *Credit Alliance*, 65 N.Y.2d at 554. *Credit Alliance* supplies the controlling standard.

*Credit Alliance* sets forth a three-prong rule for assessing near-privity. 65 N.Y.2d at 551. "Before accountants may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance." *Id.* Plaintiff satisfies each prong.

2. Marcum Knew Its Audit Reports Were to be Used by Waterford's Members for Particular Purposes

The first prong under *Credit Alliance* states that "accountants must have been aware that the financial reports were to be used for a particular purpose or purposes;" 65 N.Y.2d at 551.

In the present case, Marcum was aware its financial reports would be used for the particular purpose of investor reporting to Waterford's LLC Members. Waterford's Operating Agreement required an audit precisely so that the audited statements could be furnished to members, and Marcum knew its opinions would be enclosed in the annual investor packages. (Compl. ¶¶ 39, 126, 131, 133, 254). Marcum's engagement to audit Waterford's financials also served to satisfy the SEC's Custody Rule, a regulation designed to protect fund investors through the independent verification of client assets. 17 C.F.R. § 275.206(4)-2; Compl. ¶¶ 131, 253. Thus, the "particular purpose" of Marcum's audits was fixed by contract *and* by regulation: report to the Fund's LLC Members on the accuracy of the financial statements upon which their investment, redemption, and holding decisions depended. (Compl. ¶¶ 131, 253).

Marcum's audits served several particular purposes, each fixed before Marcum began work: reporting to Members on the accuracy of the financial statements underlying their investment, redemption, and holding decisions; satisfying the Custody Rule's investor-protection mandate; and enabling Members to prepare their individual tax returns. That last purpose follows from the Fund's structure. Waterford is a pass-through entity, so its income is attributed to its Members, on whom the federal and state tax obligations fall directly. *See Matter of Brightonian Nursing Home, Inc. v. Zucker,* 212 A.D.3d 162, 165, 181 N.Y.S.3d 728 (3d Dep't 2023). Marcum knew as much: it coordinated the Fund's annual K-1 distributions to those same Members. (Compl. ¶¶ 131, 253).

### 3. Waterford's Members Constitute a Known, Finite, Enumerated Class

The second prong in *Credit Alliance* requires that the non-client be a "known party . . . intended to rely." 65 N.Y.2d at 551. Plaintiff is one of roughly 150 to 200 Waterford LLC Members to whom Marcum's audits were addressed and delivered, and whose names, addresses, capital account balances, and investment amounts Marcum received every year. (Compl. ¶¶ 17, 132, 134, 251, 254).

Marcum's authorities on this prong involve opposite fact patterns. *Sykes v. RFD Third Ave. 1 Assoc., LLC* concerns an offering plan for apartments, where the defendant "obviously knew in general that prospective purchasers . . . would rely," but "there [was] no indication that it knew these plaintiffs would be among them." 15 N.Y.3d 370, 373–74 (2010). The court in *M&T Bank Corp. v. McGraw Hill Cos.*, rejected a "known party" theory resting on nothing more than "the small number of investors purchasing" the securities at issue. 126 A.D.3d 1414, 1418, 5 N.Y.S.3d 783 (4th Dep't 2015). Both opinions describe an open market of potential purchasers whose identities were unknown when the reports were issued. Here, Waterford was a closed fund with a fixed membership, and Marcum held the roster.

Far from a faceless or unresolved class, Waterford's LLC Members are a fixed group Marcum could and did identify. *See White,* 43 N.Y.2d at 361. In *White,* accountants retained by a limited partnership to perform an audit required by the partnership agreement were held answerable to the roughly forty limited partners, because the accountants' services "were not extended to a faceless or unresolved class of persons, but rather to a known group possessed of vested rights, marked by a definable limit and made up of certain components." 43 N.Y.2d at 361. The partnership agreement required the audit; the accountants "must have been aware" the partners would rely on it; and "[t]his was within the contemplation of the parties to the accounting retainer."

*Id.* at 361-62; *see also AUSA Life Ins. Co. v. Ernst and Young,* 206 F.3d 202, 223 (2d Cir. 2000) (second *Credit Alliance* prong satisfied where "no-default" letters were intended to convey "to the investors that the notes which they held were not in default").

Every element of that description fits this case. Waterford's membership consisted of approximately 150 to 200 investors, and Marcum knew precisely who they were: each year Waterford provided Marcum with current investor lists, capital account statements, and Schedule K-1 tax information showing names, addresses, balances, and investment amounts. (Compl. ¶¶ 132, 251). Marcum's knowledge exceeds that of the accountants in *White*: Marcum did not merely infer the class from the entity's structure — it held the list of the Members to whom it knew its opinions were disseminated. *See also Chaikovska v. Ernst & Young, LLP,* 21 A.D.3d 1324, 1326, 801 N.Y.S.2d 864 (4th Dep't 2005) (duty adequately alleged where "plaintiff was known to defendant to be a limited partner of one of the companies to which it was contractually obligated to furnish the report at issue").

Marcum's remaining argument is that its engagement agreements with Waterford state that the engagement "is being undertaken solely for the benefit of" Waterford. (Marcum Mem. 7). However, New York law determines whether an accountant owes a duty to non-clients by examining the accountant's own awareness and conduct under *Credit Alliance*, not by asking whether the accountant and its client agreed between themselves to limit the accountant's exposure. 65 N.Y.2d at 551. Marcum cannot contract with Waterford to extinguish a duty owed to Plaintiff, who signed nothing.

Marcum's conduct also contradicts the clause. A firm that believed no Member could rely on its opinion would have no reason to address that opinion "To the Members," to collect their names and capital balances year after year, or to coordinate their K-1s. (Compl. ¶¶ 132, 134, 250–

251, 254). At a minimum, the clause and the conduct join issue, and on a Rule 12(b)(6) motion that conflict resolves in Plaintiff's favor. The clause is, in any event, irrelevant to Plaintiff's fraud theory, for which privity is no bar at all. *Houbigant, Inc. v. Deloitte & Touche,* 303 A.D.2d 92, 95, 753 N.Y.S.2d 493 (1st Dep't 2003). Marcum cannot disclaim its way out of a representation it knew to be false when it made it.

4. Marcum's Course of Conduct Linked It Directly to the Members

The final prong in *Credit Alliance* requires "some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance." 65 N.Y.2d at 551. This Court found this prong satisfied by the facts pleaded in *European American Bank & Trust Co. v. Strauhs & Kaye,* decided together with *Credit Alliance,* 65 N.Y.2d at 554.

Marcum's linking conduct was the act, repeated for seven years, of addressing each audit opinion to the very Members it knew would receive and rely on it. Each opinion was addressed to that group by name — "To the Members of HASelect-Waterford LLC," and in the FY2022 report "to the Shareholders of HASelect-Waterford LLC," a variation without a difference, since an LLC has members and Marcum was addressing the same equity holders. (Compl. ¶¶ 134, 250). Each opinion was delivered to those Members in the annual report package. (Compl. ¶¶ 17, 132, 254). Marcum knew who they were and knew they would use the audited statements to prepare their own returns. That is not an audit performed in ignorance of its readers. *See White*, 43 N.Y.2d at 361 (accountant's services "were not extended to a faceless or unresolved class of persons").

Marcum's contrary authorities turn on facts absent here: an auditor who did not know, and had no way to know, which individuals would receive its report. In *Meridian Horizon Fund, LP v.*

*KPMG (Cayman),* the Second Circuit[3] rejected an "addressed to 'The Partners'" theory because "[the audited entity], not the Auditors, sent the reports to the limited partners" — the auditor's involvement ended on delivery to its client. 487 F. App'x 636, 642 (2d Cir. 2012) (summary order). But federal courts applying New York law and the *Credit Alliance* standard have found that linking conduct existed where LLC members or investors were known recipients of the subject audit opinions. *See Anwar v. Fairfield Greenwich, Ltd.,* 884 F. Supp. 2d 92, 98 (S.D.N.Y. 2012) (distinguishing cases in which there was no allegation "that the purpose of [the auditor's] engagement was to deliver information directly to the Funds' investors"); *DeLollis v. Friedberg, Smith & Co., P.C.,* 933 F. Supp. 2d 354, 361 (D. Conn. 2013); *see also Cromer Finance Ltd. v. Berger,* No. 00-CIV-2284 (DLC), 2001 U.S. Dist. LEXIS 14744 at *17 (S.D.N.Y. Sept. 19, 2001) (audit reports addressed to shareholders satisfied "linking conduct" required).[4]

Marcum's lead Second Circuit authority proves the point. In *Securities Investor Protection Corp. v. BDO Seidman, LLP*, the auditor served a registered broker-dealer and "prepared those statements for filing with the SEC and the NASD, as required under the SIPA" — not for delivery to any identified group. 222 F.3d 63, 75 (2d Cir. 2000). The claimants were the brokerage's customers, and the complaint "d[id] not allege that Seidman ever knew those investors' identities, or even of the number of customers Baron had at any one time"; they were "an unknown class of investors." *Id.* Nor had the auditor represented anything to them: those customers "never received or reviewed any of the financial statements certified by Seidman." *Id.* at 72. Marcum's position is the inverse on every fact. It received Waterford's complete member roster annually, with names,

[3] *Meridian* is a summary order and not binding precedent. See U.S. Court of Appeals for the Second Circuit Local Rule 32.1.1.

[4] *Sandalwood Debt Fund A, L.P. v. KPMG LLP*, 2013 WL 3284126 (N.J. Super. Ct. App. Div. July 1, 2013), an unpublished decision of another state's intermediate court, reached the same result on the same reasoning.

addresses, capital-account balances, and investment amounts (Compl. ¶¶ 132, 251); it addressed each opinion to those Members (Compl. ¶¶ 134, 250); and it told them an independent firm had developed and validated the valuation. Marcum knew who was reading.

*LaSalle Natl. Bank v. Ernst & Young,* 285 A.D.2d 101, 729 N.Y.S.2d 671 (1st Dep't 2001), is further afield still. *LaSalle* requires "affirmative conduct . . . other than the performance of the audit itself," *Id.* at 106–08, and Marcum supplied it. Marcum did not simply audit and hand the file to its client. It directed its opinion to a named group and told that group the valuation had been independently developed and validated by a third party — a representation that third party had disclaimed to Marcum in writing, every year. (Compl. ¶¶ 59–64, 88–89; Exh. L at 8–9). Whatever else that is, it is not the performance of the audit itself.

Marcum's *Parrott v. Coopers & Lybrand* is inapposite: the plaintiff therein failed because the accountant was "not specifically made aware" of plaintiff's reliance and the plaintiff "never read or received" the report. *Parrott,* 95 N.Y.2d at 484. The Court distinguished *White*, noting that (as herein) the limited partners in *White* would have relied on the accountant's work product in preparing their own tax returns. *Id.* at 485. *CRT Invs., Ltd. v Merkin,* relied upon by Marcum, is factually distinguishable because it involved a negligent misrepresentation claim and pre-investment misrepresentations and omissions contained in offering documents concerning a feeder fund's involvement with Bernard Madoff. 29 Misc.3d 1218(A), 918 N.Y.S.2d 397 (N.Y. Sup. Ct. N.Y. Cty. 2010); *aff'd sub nom.,* 85 A.D.3d 470 (1st Dep't 2011).

*Prime Plus Acquisition Corp. v. EisnerAmper LLP,* also relied upon by Marcum, turned on a single 2001 conversation years before the audits at issue; the court noted that "no one at EisnerAmper is alleged to have told Prime that it was entitled to rely on the 2007 and 2008 audit

reports." 2015 N.Y. Misc. LEXIS 4522, *19–20, 2015 N.Y. Slip Op. 32336[U] (Sup. Ct. N.Y. Cty. Dec. 10, 2015).

*Credit Alliance* does not require "direct dealings." *Dorking Genetics v. United States*, 76 F.3d 1261, 1270 (2d Cir. 1996); *see Travelers Cas. & Sur. Co. v. Dormitory Auth. of N.Y.*, 2005 U.S. Dist. LEXIS 9415, at *24–25 (S.D.N.Y. May 19, 2005) (direct dealings are "one of several factors that might establish a relationship sufficiently close to privity").

5. <u>At the Pleading Stage, Plaintiff's Near-Privity Allegations Must Be Credited</u>

Whether Marcum's investor-directed conduct satisfies the third *Credit Alliance* factor is fact-bound and unsuited to Rule 12(b)(6). *See Anwar*, 884 F.Supp.2d at 98 ("evidence uncovered during discovery might determine whether the Plaintiffs ultimately have proved all the elements of the *Credit Alliance* test"); *Duke v. Touche Ross & Co.*, 765 F. Supp. 69, 77 (S.D.N.Y. 1991) (denying dismissal where the report reached "a select group of qualified investors").

**C. The Complaint States a Malpractice Claim Because Marcum's Conduct Was So Reckless as to Constitute Fraud**

New York law permits a non-client to hold an accountant liable where the accountant's conduct was so reckless as to constitute fraud — and for that theory, lack of privity is no bar. *See Houbigant, Inc.,* 303 A.D.2d at 95 ("Even where the law does not permit a claim of negligence to be brought against a professional by a person not in privity with the professional, this rule 'does not emancipate accountants from the consequences of fraud.'"). Plaintiff's fraud claim defeats Marcum's privity defense by its terms and carries a six-year fraud limitations period under CPLR 213(8). (Compl. ¶¶ 256–259).

1. New York Permits a Non-Client to Sue an Accountant for Reckless Conduct Amounting to Fraud, and Privity Is No Bar

Plaintiff pleads no freestanding gross-negligence claim, and Marcum's own authority explains why none is needed. *Equitable Life* holds that "[w]hile grossly negligent conduct may lead to an inference of fraud, . . . there is no independent action for gross negligence against accountants." *Equitable Life Assurance Soc'y v. Alexander Grant & Co.*, 627 F. Supp. 1023, 1033 (S.D.N.Y. 1985) (citing *State Street Trust Co. v. Ernst*, 278 N.Y. 104, 112 (1938)). Paragraph 256 pleads gross negligence not as a cause of action but as the evidentiary predicate for the fraud-equivalent conduct *State Street* makes actionable. *See Ultramares Corp. v. Touche*, 255 N.Y. 170, 190–91 (1931) ("negligence or blindness, even when not equivalent to fraud, is none the less evidence to sustain an inference of fraud," at least "if the negligence is gross"). *State Street* further provides:

> Accountants, however, may be liable to third parties, even where there is lacking deliberate or active fraud. A representation certified as true to the knowledge of the accountants when knowledge there is none, a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon which to base liability. A refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the balance sheet.

278 N.Y. at 112.

Gross negligence is not a cause of action *or* a substitute for fraud — it is *evidence* from which the factfinder may infer the scienter element of fraud, and fraud is the theory that reaches a non-client. *Id.* at 112-13; *see also Ultramares Corp.,* 255 N.Y. at 190–91.

Further, privity is no barrier to this theory of fraud: "[l]ack of privity is not a bar to an action against an accountant for intentional misrepresentation, or the grossly negligent or reckless conduct that is its functional equivalent for these purposes." *Caprer v. Nussbaum,* 36 A.D.3d 176,

195, 825 N.Y.S.2d 55 (2d Dep't 2006) (internal citations omitted); *accord DaPuzzo v. Reznick Fedder & Silverman*, 14 A.D.3d 302, 303, 788 N.Y.S.2d 69 (1st Dep't 2005) (complaint adequately alleged fraud based on "reckless disregard or blindness to the true nature of the client's financial condition"); *Fidelity & Deposit Co. of Md. v. Arthur Andersen & Co.*, 131 A.D.2d 308, 309, 515 N.Y.S.2d 791 (1st Dep't 1987).

2. The Complaint Pleads Specific Facts Falling Under All Three *State Street* Bases of Liability

*State Street* identifies three independent grounds on which an accountant may be held answerable to a non-client absent deliberate fraud: (1) "a representation certified as true to the knowledge of the accountants when knowledge there is none"; (2) "a reckless misstatement"; and (3) "an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth." 278 N.Y. at 112. The complaint pleads particularized facts supporting each theory as follows.

**First,** Marcum certified as true representations that its own files showed were false. Marcum's audit reports told investors that the valuation methodology was "developed" by an independent "third-party" firm (**Exh. K** at 9, 11; Compl. ¶¶ 59–60) and certified fair presentation under GAAP and audits conducted under PCAOB standards. (Compl. ¶¶ 80, 128). Simultaneously, L&E's annual reports and questionnaire responses, addressed to "auditors" and delivered to Marcum every year from 2017 through 2023, disclaimed precisely what Marcum certified: L&E's values were "only guides" and "only estimates"; it had "not completed a formal audit of data"; it offered "no opinion" on accuracy; and it used portfolio assumptions "consistent with the approaches selected by the Fund's management." (Compl. ¶¶ 61–64, 85–90, 267(a), 272; **Exh. L** at 8–9). The complaint pleads Marcum's "actual knowledge (not constructive)" that the valuation was not independently validated. (Compl. ¶¶ 267(a), 272).

**Second,** Marcum's opinions were reckless misstatements, certified in disregard of contradictory evidence in Marcum's own hands. Marcum's workpapers for 2019 through 2022 record independent present-value calculations materially higher than the figures L&E reported — a discrepancy that professional standards required Marcum to investigate — yet Marcum documented no reconciliation and pronounced the lower valuation "reasonable." (Compl. ¶¶ 101, 273). Marcum audited the very acquisition transactions whose arm's-length prices implied market discount rates of 15 to more than 18%, while certifying valuations built on 10–12% rates. (Compl. ¶¶ 40–43, 55, 268, 274). It published, in its own audited statements, a sensitivity table quantifying a swing of more than $10 million between the booked value and the value at an 18% rate — and certified the booked figure anyway. (Compl. ¶ 111; **Exh. K** at 11). Lastly, Marcum issued an unqualified FY2022 opinion, with no going-concern qualification, for a fund that had suspended all redemptions and entered wind-down sixteen months earlier. (Compl. ¶ 110).

**Third,** Marcum's opinions rested on grounds "so flimsy" that no genuine belief supported them. On discount-rate reasonableness — the most material audit area — Marcum obtained no market data, performed no benchmark comparison, tested nothing against observable evidence, and documented no analysis. (Compl. ¶¶ 93–94). Its own audit index required a memo from management documenting valuation procedures; the step was marked "Not deemed necessary." (Compl. ¶ 99). The 12.25% base rate and 2015 mortality tables sat frozen from 2015 through 2022 with no documented reassessment. (Compl. ¶¶ 56–58, 104). The only documented internal control over valuation — that "Fund's management approves all significant estimates" — was never tested (Compl. ¶ 105), and no fraud-risk assessment or forensic testing followed the red flags (Compl. ¶¶ 95–97, 107). An opinion resting on that record is, as the complaint pleads, "no audit at all." (Compl. ¶¶ 98, 259).

Marcum's argument that the markups are due to its astute purchases from unsophisticated sellers is at odds with the well-pleaded allegations of the Complaint, which pleads that other sophisticated market participants purchased policies at prices indicating implied discount rates of from 15 to over 18 percent (Compl. ¶ 31), and that even when Waterford and Griffin's other funds purchased groups of policies from other sophisticated market participants, the implied discount rates were 15-18%. (Compl. ¶¶ 54-55).

3. <u>Marcum's "No Audit at All" And GAAP/GAAS Authorities Apply the Wrong Standard, but the Complaint Satisfies Them Regardless</u>

Marcum's scienter authorities do not bear the weight placed on them. In *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F.Supp.3d 401 (S.D.N.Y. 2014), and *Stephenson v. PricewaterhouseCoopers, LLP*, 768 F.Supp.2d 562 (S.D.N.Y. 2011), the auditor allegedly failed to detect a fraud committed elsewhere, on records it never held. Marcum created and distributed affirmative representations contradicted by its own files.

Under New York law, "it should be sufficient that the complaint contains some rational basis for inferring that the alleged misrepresentation was knowingly made," and plaintiffs "need not, at this time, establish the truth of their allegations" regarding the defendant's knowledge. *Houbigant*, 303 A.D.2d at 97–99. Demanding proof of an "accountant's knowingly false statement" at the pleading stage "improperly imports a summary judgment standard." *Id.* at 98.

Rule 9(b) governs how fraud is pleaded; New York law supplies what must be shown, so *Houbigant* defines the substantive standard. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015). The Rule requires the statements, the speaker, the timing, and the reason for falsity. *Id.* The complaint supplies each: the representation that an independent third-party firm "developed" the valuation methodology (Compl. ¶¶ 59–60); the speaker, Marcum; the occasion, each annual audit opinion from FY2017 through FY2023 (Compl.

¶¶ 132, 134, 250); and the falsity, established by L&E's contemporaneous written disclaimers sitting in Marcum's own files (Compl. ¶¶ 61–64, 85–90). Scienter requires no particularity: "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *accord Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996).

### D. The Complaint States a Claim for Aiding and Abetting Breach of Fiduciary Duty

A claim for aiding and abetting a breach of fiduciary duty requires (1) a breach by a fiduciary, (2) that the defendant knowingly induced or participated in the breach, and (3) resulting damage. *Kaufman v. Cohen*, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157 (1st Dep't 2003). Further, aiding-and-abetting liability does not depend on near-privity: an aider is liable for breach of fiduciary duty "even if he or she had no independent fiduciary obligation to the allegedly injured party, if the alleged aider and abettor rendered 'substantial assistance' to the fiduciary in the course of effecting the alleged breaches of duty." *Caprer,* 36 A.D.3d at 193.

Marcum does not dispute that the Griffin Defendants owed and breached fiduciary duties to the Fund's members. (Compl. ¶¶202–217). Marcum disputes only knowledge and substantial assistance and states the claim is duplicative. Each argument fails.

#### 1. <u>The Complaint Pleads Marcum's Actual Knowledge</u>

Actual knowledge "need only be pleaded generally" and may be shown by circumstantial evidence; a plaintiff need not plead "exactly what the accountant knew." *Bullen v. CohnReznick, LLP,* 194 A.D.3d 637, 637-38, 150 N.Y.S.3d 53 (1st Dep't 2021) (quoting *Oster v. Kirschner,* 77 A.D.3d 51, 55, 905 N.Y.S.2d 69 (1st Dep't 2010), and *Houbigant,* 303 A.D.2d at 97.).

The Appellate Division, First Department applied this standard to sustain an aiding-and-abetting claim against a fund's outside accountant on facts materially similar to the present case. In *CohnReznick,* the auditor's "multiple years of auditing the fund's financial statements," receipt

of information indicating "a material weakness in the process of asset valuation," and "access to the fund's financial information" supported the inference that the auditor "willingly turned a blind eye to evidence" that the fund's valuations were fraudulent. 194 A.D.3d at 638. The *CohnReznick* court held that actual knowledge had been sufficiently alleged, barring dismissal. *Id.; see also Bankers Conseco Life Ins. Co. v. KPMG LLP*, 189 A.D.3d 402, 402, 137 N.Y.S.3d 10 (1st Dep't 2020) (sustaining aiding-and-abetting fraud claim against auditor on general pleading of actual knowledge). The First Department has thus repeatedly enforced a rule of law that defeats Marcum's motion to dismiss this claim: "reasonable reliance is not generally a question to be resolved as a matter of law on a motion to dismiss." *CohnReznick,* 194 A.D.3d at 638 (quoting *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 25 N.Y.3d 1043, 1045 (2015)).

Marcum's argument also misreads the pleading. Marcum contends that Plaintiff pleads no more than Marcum's "access to information by which it could have discovered the fraud" — constructive knowledge, not actual (Mot. 13) — but ¶ 267 alleges the opposite — "actual knowledge (not constructive)" — and pleads facts that mirror *CohnReznick*. Marcum audited Waterford for seven straight years (Compl. ¶¶ 10, 80); it received L&E's written disclaimers that the valuation was not independently validated (Compl. ¶¶ 267(a), 272); its own workpapers reflect present-value calculations that materially differed from the values it certified (Compl. ¶¶ 268, 273); and it audited the acquisition transactions whose prices implied market rates of 15% to over 18% while management applied 10–12% (Compl. ¶¶ 267(b), 274). Those allegations support the reasonable inference that Marcum, at a minimum, willingly turned a blind eye to the Fund's inflated valuations.

2. The Complaint Pleads Substantial Assistance

Substantial assistance exists where the defendant "affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Kaufman*, 307 A.D.2d at 126. The New York Appellate Division, Second Department applied that standard to accountants in *Caprer*, where the accountants "had complete knowledge of the misuse of [the entity's] funds, and were indispensable to the board-member defendants in their efforts to conceal the misuse of those funds." 36 A.D.3d at 193. New York courts have likewise sustained substantial-assistance claims against valuation professionals on materially identical facts. In *Bullen v. Sterling Valuation Group, Inc.*, the court held that a valuation firm supplied substantial assistance by "adopting" a fund manager's "improper valuations" and "failing to act to challenge" those valuations "when required to do so," thereby helping to conceal the fraud. 67 Misc.3d 1227(A), 2-5, 128 N.Y.S.3d 154 (Sup. Ct. N.Y. Cty. 2020). The complaint alleges exactly that. (Compl. ¶¶ 270, 278).

*CRT Invs., Ltd. v. Merkin,* 29 Misc.3d 1218(A), is distinguishable. In *CRT Invs.,* the complaint pleaded "nothing more than . . . the routine business of auditing," 29 Misc.3d at 3. Conversely, in the present case, Marcum made affirmative misrepresentations to the investor group — that a "third-party" firm independently "developed" and validated the valuation — that Marcum knew to be false. (Compl. ¶¶ 59–64, 270, 272). Affirmatively vouching for a valuation, the auditor knows is unsupported is the "help[ing] conceal" that *Kaufman* and *Sterling* hold sufficient. *See also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,* 479 F.Supp.2d 349, 371 (S.D.N.Y. 2007) (where the primary wrong consists of misrepresentations in a document, substantial assistance turns on whether the aider assisted "the making and dissemination of that document").

Finally, Marcum's reliance on the general disclaimers in L&E's reports (**Exh. L**) does not defeat the claim: a general disclaimer does not preclude reliance where it is not specific and

concerns "facts peculiarly within" the professional's knowledge. *Sterling,* 67 Misc.3d at 3, *et seq.* Whether Marcum's assistance was "substantial" is a question of fact inappropriate for resolution on the pleadings.

3. The Aiding-and-Abetting Claim Is Not Duplicative

The claim is not duplicative. "The key to determining whether a claim is duplicative of one for malpractice is discerning the essence of each claim." *Johnson v. Proskauer Rose LLP*, 129 A.D.3d 59, 68, 9 N.Y.S.3d 201 (1st Dep't 2015). Shared facts do not make claims duplicative; claims are duplicative only where they are "premised on the same facts and seeking . . . identical relief." *Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*, 56 A.D.3d 1, 9, 865 N.Y.S.2d 14 (1st Dep't 2008).

The essences differ here, and they differ in the two ways that matter. The malpractice count rests on a duty Marcum owed Plaintiff directly, and on Marcum's failure to meet it. The aiding-and-abetting count rests on a duty someone else owed — the Griffin Defendants' fiduciary duty to the Members — and on Marcum's knowing participation in its breach. Different duty-holder, different wrong. The proof differs too: negligence sustains the malpractice count, while the aiding-and-abetting count requires actual knowledge, which the malpractice count never demands. The First Department drew exactly that line in *Wimbledon Fin. Master Fund, Ltd. v. Hallac*, 192 A.D.3d 617, 618, 146 N.Y.S.3d 18 (1st Dep't 2021), sustaining aiding-and-abetting fraud and breach-of-fiduciary-duty claims against a professional defendant as "not time-barred malpractice claims in disguise" because "[t]he essence of these claims is not negligence or 'a failure to utilize reasonable care'; rather, plaintiff alleges intentional acts." *See also 1650 Broadway Assoc., Inc. v. Sturm*, 228 A.D.3d 1, 210 N.Y.S.3d 19 (1st Dep't 2024) (reinstating both accounting malpractice and aiding-and-abetting fraud claims against the same accounting firm).

*Hoffman v. RSM US LLP,* 169 A.D.3d 522, 94 N.Y.S.3d 265 (1st Dep't 2019), cited by Marcum, confirms the point rather than undermining it. Claims against an accounting firm were duplicative there "to the extent both . . . allege that defendants ignored their professional duties," were "based on defendants' conflicts of interest," or were "based on nondisclosure." *Id.* at 523. But the aiding-and-abetting claim survived "to the extent [it] alleges that defendants gave [the primary wrongdoer] specific advice that allowed him to perpetrate a fraud." *Id.* Plaintiff's claim is of that second kind. It does not rest on Marcum ignoring its professional duties or failing to speak. It rests on what Marcum affirmatively said — that a third party had independently developed and validated a valuation Marcum's own files showed was unsupported. (Compl. ¶¶ 59–64, 270, 272).

**E. All of Plaintiff's Claims Are Timely**

Marcum's limitations argument fails on Marcum's own evidence and on settled accrual rules. Both claims are governed by the six-year fraud period; and in all events the FY2022 and FY2023 reports are independently timely under the three-year period.

1. <u>Plaintiff's Claims Are Governed by the Six-Year CPLR 213(8) Fraud Limitations Period</u>

Where an accountant's conduct allegedly constitutes fraud or its reckless equivalent, the six-year period of CPLR 213(8) applies, not the three-year period for ordinary negligence. *Kaufman,* 307 A.D.2d at 119 (Marcum's own cited authority). Further, where fraud is essential to the underlying breach of fiduciary duty, the aiding-and-abetting claim likewise carries the six-year period. *Monaghan v. Ford Motor Co.*, 71 A.D.3d 848, 850, 897 N.Y.S.2d 482 (2d Dep't 2010) (applying the six-year period and declining to dismiss an aiding-and-abetting claim as time-barred where fraud was essential to the underlying breach); *Cusimano v. Schnurr*, 137 A.D.3d 527, 531, 27 N.Y.S.3d 135 (1st Dep't 2016). The Appellate Division, First Department applied that rule to

an aiding-and-abetting claim against a professional in *Wimbledon*, holding the six-year period governs where the underlying breach of fiduciary duty rests on actual fraud. 192 A.D.3d at 618.

Marcum will answer that CPLR 214(6) fixes a three-year period for nonmedical malpractice "regardless of whether the underlying theory is based in contract or tort." *Chase Scientific Research v. NIA Group,* 96 N.Y.2d 20, 24 (2001). But that rule governs malpractice, and "professional malpractice does not generally encompass intentional acts." *New York State Workers' Compensation Bd. v. Fuller & LaFiura, CPAs, P.C.,* 146 A.D.3d 1110, 1114, 46 N.Y.S.3d 266 (3d Dep't 2017); *see also Mitschele v. Schultz,* 36 A.D.3d 249, 253, 826 N.Y.S.2d 14 (1st Dep't 2006).

The two-year discovery rule independently preserves any earlier report. A fraud claim may be commenced within two years of the date the plaintiff discovered the fraud or, with reasonable diligence, could have discovered it. CPLR 203(g); *Vilsack v. Meyer,* 96 A.D.3d 827, 828, 946 N.Y.S.2d 595 (2d Dep't 2012) (quoting *Sargiss v. Magarelli,* 12 N.Y.3d 527, 532 (2009)). Plaintiff first learned of the scheme only when Marcum produced its workpapers and the L&E disclaimers in response to the Cook County discovery demand in 2024–2025. (Compl. ¶¶179–182, 245).[5]

2. <u>Even Under the Three-Year Malpractice Period, the FY2022 and FY2023 Audits Are Timely</u>

Even measured against the three-year period that governs ordinary malpractice — which runs from the date the audit report is received, CPLR 214(6) (Marcum cites CPLR 214(4), which governs injury to property, *Ackerman v. Price Waterhouse,* 84 N.Y.2d 535, 541 (1994)) — the claims on the later audits are timely. Plaintiff filed on February 23, 2026, so any claim on a report issued on or after February 23, 2023, is timely — as Marcum concedes by arguing only that "claims

[5] When a party should have discovered fraud is "[o]rdinarily . . . a mixed question of law and fact." *Vilsack,* 96 A.D.3d at 828.

based on audit reports prior to February 23, 2023 are barred." (Marcum Mem. 1). Marcum's own declaration authenticates its FY2022 audit report, "dated April 5, 2023" (Ballard Decl. ¶ 13; **Exh. K** at 2) — after the cutoff — and the complaint alleges a still-later FY2023 report furnished to investors. (Compl. ¶¶ 10, 59, 80).

Marcum's premise — that a post-2021 audit could not have injured Plaintiff — mistakes the injury. The redemption freeze is not the only harm, and it is not the harm the timely reports caused. Management, incentive, and platform fees were each calculated as a percentage of net asset value. (Compl. ¶¶ 36–37). Every audit certifying the inflated valuation kept that figure on the books, and for as long as it stayed there, fees were computed against it and drawn from Plaintiff's own capital account — a fresh loss, calculated individually as to each Member, and recurring quarter after quarter. (Compl. ¶¶ 36–37, 117–118, 190).

Marcum's own limitations authority confirms that each audit stands alone. In *Williamson v. PricewaterhouseCoopers LLP,* 9 N.Y.3d 1 (2007), the Court of Appeals held that a fund's "annual engagements . . . for the provision of separate and discrete audit services" do not merge into a continuous course of representation, *id.* at 10–11, and that a malpractice claim "accrues upon the client's receipt of the accountant's work product," *id.* at 7–8; *accord Ackerman,* 84 N.Y.2d at 541. The result in *Williamson* is the result here: the claims on the earlier audits were time-barred, and the claim on the latest audit was timely and went forward. Marcum invokes *Williamson* to defeat tolling (Marcum Mem. 18); it cannot take the case's premise and refuse its consequence. Each Marcum audit carries its own accrual date, and the FY2022 opinion — dated April 5, 2023 — falls inside the window Marcum itself concedes. (Marcum Mem. 1).

Marcum reads *Williamson* as a categorical rule that annual engagement letters foreclose any continuing professional relationship. (Marcum Mem. 18). The Appellate Division, Second

Department rejected that reading in *Symbol Tech., Inc. v. Deloitte & Touche, LLP*, 69 A.D.3d 191, 196, 888 N.Y.S.2d 538 (2d Dep't 2009). There, each audit "was governed by a separate and discrete engagement letter which explicitly stated that the service to be provided was to audit and report on [the client's] financial statements for a particular fiscal year" — and the court cited *Williamson* for exactly that proposition. *Symbol Tech.,* 69 A.D.3d at 196; *see also Williamson,* 9 N.Y.3d at 10-11. The court nonetheless sustained the malpractice claim, holding that the auditor's continued work on the same subject matter "without seeking the execution of new engagement letters suggests the continuation of their professional relationship" for the earlier years. *Symbol Tech.,* 69 A.D.3d at 197–98. *Williamson* turns on whether the engagement letters were honored in fact, not on their existence — a question the pleadings do not resolve against Plaintiff.

3. <u>The Savings Statute and Equitable Estoppel Are Additional Grounds the Court Need Not Reach.</u>

If the six-year period and discovery rule apply, the Court need not reach these grounds; but each independently preserves any claim Marcum contends is untimely.

**First,** the savings statute. CPLR 205(a) gives plaintiffs six months to recommence on the same transactions after a timely prior action is terminated for any reason other than the merits, a voluntary discontinuance, a jurisdictional failure, or neglect to prosecute. This is a remedial statute whose "broad and liberal purpose is not to be frittered away by any narrow construction," and it reaches prior actions brought in different forums. *Norex Petroleum Ltd. v. Blavatnik*, 23 N.Y.3d 665, 678 (2014). Plaintiff commenced the Cook County Action — which Marcum dates to May 2, 2025 (Marcum Mem. 3) — within the six-year fraud period and within three years of the FY2022 report, asserting the "same core factual allegations asserted herein." (Compl. ¶ 172). That action was dismissed on forum grounds, "not based on merits" but "purely procedural." (Compl. ¶¶ 176–

177). Plaintiff filed here on February 23, 2026, thirty-four days later, well within the six-month window.

Marcum answers that a respondent in discovery is not a "defendant," citing *Raji v. SG Ams. Sec., LLC,* 189 A.D.3d 514, 133 N.Y.S.3d 789 (1st Dep't 2020), and *Caplan v. Winslett,* 218 A.D.2d 148, 637 N.Y.S.2d 967 (1st Dep't 1996). In each, the prior complaint "fail[ed] even to mention" the later defendant. *Caplan,* 218 A.D.2d at 149. Here, the Cook County complaint named Marcum; Section 2-402 requires that a respondent be served with that complaint and a summons and requires the respondent to "respond to discovery by the plaintiff in the same manner as are defendants." 735 ILCS 5/2-402. Marcum produced more than 35,000 pages of workpapers in response. (Compl. ¶ 174). CPLR 205(a) imposes no same-defendant condition in its text; it asks whether the new action rests on "the same transaction or occurrence." Its purpose is to relieve "the harsh consequence of applying a limitations period where the defending party has had timely notice of the action." *Malay v. City of Syracuse*, 25 N.Y.3d 323, 327 (2015). Marcum had that notice. Section 205(a) is in any event an alternative ground the Court need not reach.

Plaintiff preserves equitable estoppel without further argument here: Marcum's successive unqualified opinions, through the report for fiscal year 2023, told the Members year after year that the valuations were sound. (Compl. ¶¶ 59–64, 80). Whether that reassurance lulled Plaintiff is a question of fact. *See Simcuski v. Saeli,* 44 N.Y.2d 442, 448–49 (1978).

**F. Leave to Amend Should Be Freely Granted**

Leave to amend is to be "freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2). Marcum's reliance on *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir. 1993), is misplaced. To the extent the Court identifies a curable pleading defect — for example, in the

particulars of linking conduct or substantial assistance — that is precisely the situation Rule 15 addresses, and those theories should be dismissed, if at all, without prejudice.

## III. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Marcum LLP's motion to dismiss in its entirety; or, in the alternative, grant any dismissal without prejudice and with leave to amend; grant Plaintiff's request for oral argument; and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
August 17, 2026

Respectfully submitted,

LAW OFFICE OF
CHRISTOPHER J. GRAY, P.C.

By: ______________________
Christopher J. Gray
Carah Jones
60 East 42nd Street, 46th Floor
New York, New York 10165
(212) 838-3221
chris@investorlawyers.net

LOFTUS & EISENBERG, LTD.
Alexander N. Loftus (*pro hac vice*)
181 W. Madison Street, Suite 4700
Chicago, Illinois 60602
(312) 899-6625
alex@loftusandeisenberg.com

*Attorneys for Plaintiff*

**CERTIFICATE OF WORD-COUNT COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, I certify that the foregoing Memorandum of Law — exclusive of the caption, table of contents, signature block, and this certificate, and inclusive of footnotes — contains 8,237 words as measured by the word-count feature of the word-processing program used to prepare it, and therefore complies with the 8,750-word limit.

/s/ Christopher J. Gray